[No. 62275-2.    En Banc.    October 12, 1995.]

THE STATE OF WASHINGTON, *Respondent,* v. JAMES EDWARD BROWN, *Petitioner.*

*Jessica A. Ryan, Joshua Weinstein,* and *Suzanne Lee Elliott* of *Washington Appellate Defender Association*; and *Nielsen & Acosta,* by *Eric J. Nielsen,* for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *Lisa D. Johnson, Cynthia S. Gannett,* and *Pamela K. Mohr, Deputies,* for respondent.

PEKELIS, J. — James Brown (Brown) appeals from a Court of Appeals' decision affirming his conviction for second degree rape on the grounds that the trial court erred in (1) admitting the victim's 911 tape as an excited utterance despite her testimony that she had decided to fabricate a portion of her story prior to making the call, and (2) giving a lesser included offense instruction for second degree rape when there was no affirmative evidence supporting an inference that he committed only that crime. We reverse.

On December 15, 1990, T.G. called 911 to report that she had been raped. Officer Shirley Ann Hallam (Hallam) was dispatched to the scene where she interviewed T.G. T.G. told Hallam that she had been abducted, forced into her neighbor Brown's apartment, and then raped by four men. According to T.G., Brown threatened to cut her insides out with a kitchen knife, pulled out a gun and

played Russian roulette with her, and tried to burn her with a curling iron.

Brown and his three alleged accomplices, Robert Brown, Anthony Cole, and Daniel Williams, were later arrested and charged with first degree rape. James Brown and Cole were tried together.

At a pretrial hearing, the trial court listened to the tape of T.G.'s 911 call to determine its admissibility. It ruled that the tape was admissible as an excited utterance. Brown objected.

At trial, T.G. testified that she had gone to Brown's apartment willingly on the evening of the alleged rape. She had been in her apartment with her boyfriend Terry and her children when Brown knocked on the door. T.G. then spoke to him outside where she agreed to go to his apartment in order to perform fellatio in exchange for money.

T.G. testified that she then accompanied Brown to his apartment. Once inside Brown's bedroom, she felt that something was wrong and tried to leave. When she opened the front door, however, four men grabbed her and forced her back into the bedroom where the men raped her for approximately two hours. About an hour and a half into the rape, Brown left the room and returned with a gun. Brown held the gun to T.G.'s head and began clicking it. Meanwhile the other men continued raping her. Brown then left the room again and returned with a curling iron. He plugged in the curling iron and touched T.G.'s feet with it. She moved her feet away to avoid being burned.

T.G. further testified that eventually Brown was left alone in the room with her. At that point, she observed Brown loading the gun with bullets. Brown asked the man who was in the bathroom across the hall, "Should I kill her?" The man responded, "Yes, but wait until I leave." Brown held the gun to her head and told her that if she had enough guts, she should try to escape. Brown then walked out of the room, and T.G. escaped by jumping out the window onto the balcony.

Finally, T.G. testified that she returned to her apartment and told Terry that she had been raped. Terry told her to call the police. T.G. responded by saying, "I can't because I went up to his apartment and nothing would happen." (Report of Proceedings at 520.) She explained that by that comment she meant that she did not think the police would believe she was raped because she went to the apartment willingly and the police knew she was a prostitute. Terry suggested that she think of something. T.G. admitted that it was after this conversation that she decided to tell the police that she had been abducted. She then went to the assistant manager's apartment to use the phone and called 911 to report the rape.

During cross-examination, T.G. also admitted that she had not seen a knife during the rape. She did, however, acknowledge having told Officer Hallam that there had been a knife.

After T.G.'s testimony, Brown renewed his objection to the admission of the 911 tape on the ground that it was not an excited utterance. The motion was denied.

Brown also testified at trial. According to Brown, he went to T.G.'s apartment to sell her drugs. He went inside the apartment, and he, T.G., and Terry consumed cocaine. Later, T.G. came to his door and wanted to buy drugs. After giving him $4 in cash and $2 in food stamps for drugs, T.G. suggested exchanging sex for drugs. Brown agreed and engaged in oral sex with her.

Brown testified that he then left T.G. alone in the bedroom and when he returned, she was gone. He discovered that she had stolen drugs. He then went to her apartment and knocked loudly but no one answered.

The State proposed instructing the jury on second degree rape, as well as on the charged crime of first degree rape. Brown objected to the instruction on the lesser included offense. The trial court overruled his objection and submitted the instruction to the jury.

The jury could not reach a unanimous verdict on first degree rape. It concluded, however, that Brown was guilty

of the lesser included offense of second degree rape. He appealed to the Court of Appeals, which affirmed his conviction in an unpublished opinion.

## I
### LESSER INCLUDED OFFENSE INSTRUCTION

■ Brown first contends that the trial court erred in instructing the jury on the lesser included offense of second degree rape. In *State v. Workman,* 90 Wn.2d 443, 584 P.2d 382 (1978), we established the following two-prong test for determining whether a lesser included offense instruction should be given: "First, each of the elements of the lesser offense must be a necessary element of the offense charged. Second, the evidence in the case must support an inference that the lesser crime was committed." (Citations omitted.) *Id.* at 447-48. Brown concedes that the first prong of the *Workman* test has been satisfied. He, however, contends that the State failed to satisfy the second prong of the test. We agree.

To satisfy the factual prong of *Workman,* there must be some affirmative proof that the defendant committed only the lesser crime. *State v. Fowler,* 114 Wn.2d 59, 67, 785 P.2d 808 (1990). Brown was charged with first degree rape, the elements of which include engaging in sexual intercourse with a person by forcible compulsion and using or threatening to use a deadly weapon. RCW 9A.44.040. The elements of second degree rape include sexual intercourse with another by forcible compulsion. RCW 9A.44.050. Second degree rape, however, does not require the State to prove the use or threatened use of a deadly weapon. RCW 9A.44.050. Brown argues that neither party introduced affirmative evidence that he committed only second degree rape. He notes that T.G. testified that Brown and his three accomplices forced her to have sexual intercourse and that Brown held a gun to her head at one point during the attack. Brown, on the other hand, testified that he and T.G. engaged in consensual sex for money. He denied raping her. Based on this testimony, Brown argues that nei-

ther party presented evidence that would support the conclusion that he raped T.G. but did not threaten to use a deadly weapon.

The Court of Appeals concluded that there was affirmative evidence that Brown committed only second degree rape because there was evidence which tended to impeach T.G.'s claim that a gun was used. The Court of Appeals ruled that the jury could have found that no gun was used because T.G. appears to have fabricated an earlier statement about a knife and she admittedly fabricated the story of the abduction. According to the Court of Appeals, this evidence constituted affirmative evidence that Brown was guilty of only second degree rape.

Brown, however, wisely asserts that the Court of Appeals' ruling contradicts this court's precedent. In *Fowler,* we held that "affirmative evidence" requires something more than the possibility that the jury could disbelieve some of the State's evidence. *Fowler,* 114 Wn.2d at 67; *see also State v. Speece,* 115 Wn.2d 360, 363, 798 P.2d 294 (1990). Impeachment evidence that serves only to discredit the State's witness but does not itself establish that only the lesser crime was committed cannot satisfy the factual prong of *Workman. See Fowler,* 114 Wn.2d at 67.

The State, nevertheless, contends that it did produce affirmative evidence that Brown could have been guilty of only second degree rape.[1] The State focuses on the fact that the gun was not originally used to force T.G. to submit to sexual intercourse. T.G. testified that she was raped over a two-hour period and that it was not until an hour and a half into the rape that Brown first produced the gun. Thus, some other form of forcible compulsion was used to make T.G. initially submit to the rape. The State

---

[1]In its brief, the State contends that there was evidence that Brown first produced the gun only after the rape was complete. (Supplemental Br. of Resp't at 8, 15.) This assertion is not supported by the record, and, indeed, at oral argument the State conceded that the other men were still raping T.G. when Brown first displayed the gun.

argues that the absence of the gun during the first portion of the rape could support a finding that Brown was guilty of only second degree rape.

The first degree rape statute, however, does not require that the deadly weapon be the direct means of forcible compulsion. In pertinent part, the first degree rape statute reads:

> (1) A person is guilty of rape in the first degree when such person engages in sexual intercourse with another person by forcible compulsion where the perpetrator or an accessory:
>
> (a) Uses or threatens to use a deadly weapon or what appears to be a deadly weapon; or
>
> (b) Kidnaps the victim; or
>
> (c) Inflicts serious physical injury . . . .

RCW 9A.44.040.

■ Under the statute, the use or threatened use of a deadly weapon during the assault constituting the rape is an aggravating factor elevating the crime to first degree rape. The plain language of the statute supports no other conclusion. We think it unlikely that the State would argue under subsection (c) that if an assailant inflicts serious physical injury on his victim only after completing sexual intercourse, he is guilty of only second degree rape. Just as the infliction of serious bodily injury increases the harmful effect of the crime, the threatened use or use of a deadly weapon increases the psychological, if not the physical, impact on the rape victim regardless of whether it is the initial or sole form of forcible compulsion. We therefore reject the State's contention that the fact that Brown produced the gun only after the rape was already in progress has some legal significance.

Based on the foregoing, we conclude that the State has failed to satisfy the factual prong of *Workman.* As a result, it was error to instruct the jury on the lesser included offense of second degree rape.

■■ Due to double jeopardy concerns, the defendant

cannot be retried on charges greater than the charge for which he was convicted. *State v. Markle,* 118 Wn.2d 424, 441, 823 P.2d 1101 (1992); *State v. Anderson,* 96 Wn.2d 739, 742, 638 P.2d 1205, *cert. denied,* 459 U.S. 842 (1982); *Green v. United States,* 355 U.S. 184, 190-91, 78 S. Ct. 221, 2 L. Ed. 2d 199 (1957). He may be retried, however, on any convicted offense, so long as the reversal was not for insufficiency of the evidence. *Markle,* 118 Wn.2d at 440-41; *Anderson,* 96 Wn.2d at 744. This is so even if the conviction is a result of an improper instruction on a lesser included offense. *See State v. Irizarry,* 111 Wn.2d 591, 596, 763 P.2d 432 (1988) (remanding for new trial on the offense of felony murder despite error in instructing jury to consider it as an "included offense" of aggravated, first degree murder). Our reversal here is not based on the insufficiency of the evidence to support a second degree rape, but on the impropriety of allowing the jury to consider that charge as a lesser included offense of first degree rape. Accordingly, we reverse and remand for a new trial on second degree rape.

## II

### EXCITED UTTERANCE

Brown next contends that the trial court erred in admitting the tape of T.G.'s 911 call under the excited utterance exception to the hearsay rule. Under ER 803(a)(2), an out-of-court statement is admissible if it relates to "a startling event or condition made while the declarant was under the stress or excitement caused by the event or condition." Brown acknowledges that the rape constituted a startling event. He argues, however, that because there was evidence that T.G. had decided to lie to the police about being abducted *prior* to making the 911 call, the call cannot constitute an excited utterance. Again, we agree.

■ The Court of Appeals upheld the trial court's ruling, reasoning that despite T.G.'s apparent ability to reflect on the credibility of her story prior to making the 911 call, there nevertheless were tenable grounds for admitting the

tape. The trial court had heard T.G.'s testimony that she feared the police would not believe that she had been raped if she admitted to having initially consented to an act of prostitution. The Court of Appeals concluded that it was within the trial court's discretion to consider this evidence when evaluating the reliability of the statements contained in the 911 tape.[2]

While we are sympathetic to the Court of Appeals' desire to defer to the trial court's evaluation of the complaining witness' credibility and hence ultimately of the tape's reliability, this approach has no place in the excited utterance rule. The excited utterance exception is based on the idea that:

> 'under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control.' The utterance of a person in such a state is believed to be 'a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock,' rather than an expression based on reflection or self-interest.

*State v. Chapin,* 118 Wn.2d 681, 686, 826 P.2d 194 (1992) (quoting 6 John Henry Wigmore, *Evidence* § 1747, at 195 (Chadbourn rev. 1976)).

As a result, the "key determination is 'whether the statement was made while the declarant was still under the influence of the event to the extent that [the] statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment.' " *State v. Strauss,* 119 Wn.2d 401, 416, 832 P.2d 78 (1992) (quoting

---

[2]The Court of Appeals also concluded that the tape was admissible as a prior consistent statement offered to rehabilitate T.G. after she was impeached with evidence that she fabricated the story of her abduction. The State wisely abandons this argument in its brief to this court. Prior consistent statements may be used to rebut a claim of fabrication only when the statements were made prior to the time that the motive to fabricate arose. *State v. Purdom,* 106 Wn.2d 745, 750, 725 P.2d 622 (1986); *see also State v. Bargas,* 52 Wn. App. 700, 703, 763 P.2d 470 (1988), *review denied,* 112 Wn.2d 1005 (1989). T.G.'s testimony that she decided to fabricate a portion of her story before the 911 call indicates that any motive to lie arose before the alleged prior consistent statement was made. Mere repetition of a statement made when the motive to fabricate was the same does nothing to establish veracity. *Purdom,* 106 Wn.2d at 750.

*Johnston v. Ohls,* 76 Wn.2d 398, 406, 457 P.2d 194 (1969)). It is thus apparent that T.G.'s testimony that she had the opportunity to, and did in fact, decide to fabricate a portion of her story prior to making the 911 call renders erroneous the trial court's conclusion that the content of her call was admissible as an excited utterance. Therefore, the 911 tape is to be excluded on remand.

DURHAM, C.J., and DOLLIVER, SMITH, GUY, JOHNSON, MADSEN, ALEXANDER, and TALMADGE, JJ., concur.