[No. 40618-3-I.    Division One.    April 19, 1999.]

THE STATE OF WASHINGTON, *Respondent*, v. LEONARD L. BRISCOERAY, *Appellant*.

*Stella S. Buder* of *Washington Appellate Project*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Andrew J. Ries, Deputy*, for respondent.

APPELWICK, J. — Leonard Briscoeray appeals his conviction for attempted second degree murder and second degree assault. He argues that the trial court erred in admitting as excited utterances certain incriminatory statements that the victim made soon after the assault. We review this assignment of error for abuse of discretion and not de novo. We hold that the trial court did not err in admitting the evidence. Although the victim later retracted the statements at issue, and testified that she had lied at the time of her contact with authorities, the original statements were nonetheless admissible as excited utterances. This is because there was substantial evidence that the statements were uttered while the victim was still under the stress of excitement caused by the startling event, and that the victim had not in fact had an opportunity to fabricate her story. Finally, we find no merit to the assignments of error that Briscoeray raises in his pro se supplemental brief. We therefore affirm the conviction.

## FACTS

On the night of June 13, 1996, Bruce Heyward was working as a security officer in a guard shack at the Seward Park Estates apartment complex in Seattle. He received a phone call from an anonymous tenant describing domestic violence occurring in the apartment occupied by Leonard Briscoeray and his girl friend, Maketa Brazier. About 30 or

40 seconds after Heyward received the call, Brazier ran up to the guard shack crying and screaming, "He tried to kill me! He tried to kill me! Just call 911. Call 911." Heyward noticed bruising on Brazier's face. He told her to calm down and tell him what happened. She replied, "He tried to kill me, he tried to kill me. He put the gun to my head, clicked it six times." Heyward immediately called 911.

Heyward told the 911 operator what Brazier had just told him, that Briscoeray had pulled a gun on her and clicked it to her head. While Heyward was talking to the operator, Brazier told him that the gun contained one bullet; Heyward conveyed this information to the operator. Heyward then gave the receiver to Brazier to answer the operator's specific questions. Brazier told the operator that Briscoeray had fired a .380 caliber handgun loaded with one bullet at her but the gun had jammed, and that he had stepped on her face. Heyward testified that during the course of the call, Brazier was still upset and frantic.

While Brazier was still on the line, Police Officer Carpenter arrived at the guard shack. He noticed bruising on Brazier's face, and immediately asked her what had happened. Brazier explained that she was nine weeks pregnant and experiencing complications from her pregnancy, and that she and Briscoeray had been arguing about her inability to work overtime as a result of her pregnancy. She said that Briscoeray had thrown a beer bottle at her, pushed her to the floor and stepped on her head, then pointed a handgun directly at her face and pulled the trigger. The gun clicked but did not fire, and Briscoeray repeated the action several times. When Briscoeray removed the clip, she saw that it contained one bullet. Carpenter testified that Brazier seemed calm and controlled at first, but became upset and teary at times as she told him what happened. Brazier signed a written statement for Carpenter, which recounted essentially the same story.

After speaking with Officer Carpenter, Brazier went to a friend's house. Soon after, she experienced vaginal bleeding and her friend called an ambulance. While at the hospital,

Brazier spoke with a social worker, Scott Martin, about the fight with Briscoeray. She told Martin that Briscoeray had thrown a beer bottle at her, had shoved her to the floor and put a shoe on her forehead, and had pointed a loaded pistol at her face and pulled the trigger.

Briscoeray was arrested on the morning of June 14, 1996. After his arrest, police executed a search warrant and found a .380 semiautomatic handgun in a couch in the living room. A police officer testing the gun discovered that it tended to jam.

Briscoeray was charged by amended information filed in King County Superior Court with one count of attempted murder in the second degree, RCW 9A.32.050(1)(a), and one count of assault in the second degree, RCW 9A.36-.021(1)(c).

At pretrial hearings, Briscoeray's counsel objected to admission of the statements that Brazier had made to Heyward while he was talking to the 911 operator, statements she had made to Officer Carpenter and Social Worker Martin, and to Brazier's and Heyward's statements on the 911 tape. The court admitted the statements as exceptions to the hearsay rule. The court admitted Brazier's statements to Heyward, the 911 operator, and Carpenter as excited utterances. The court admitted Heyward's statements to the 911 operator as a present sense impression of an event or condition. The court admitted Brazier's statements to Social Worker Martin as statements made for the purposes of medical diagnosis or treatment.

The case was tried before a jury. At trial, Brazier denied that the incident occurred as she had previously described it. She admitted that she and Briscoeray argued that night, but denied that Briscoeray assaulted her or used a gun in any way. She claimed that he accidentally stepped on her head as he tried to restrain her. She testified that the couple argued primarily because Briscoeray had threatened to leave her. She explained that this made her angry, and she decided to make up a story about a gun in order to have Briscoeray arrested. She claimed that she made up the

story before she got to the guardhouse. She testified that she knew Briscoeray had previously had possession of a gun that tended to jam.

Despite Brazier's recantation, the jury found Briscoeray guilty as charged. The court sentenced him to 150 months in prison. Briscoeray appeals.

## ANALYSIS

Briscoeray essentially argues that the trial court erred in admitting as excited utterances the statements that Brazier made to Security Officer Heyward after he had begun the 911 call, and the statements she made to the 911 operator and to Police Officer Carpenter.

### Standard of Review

■ The parties dispute what is the proper standard of review. The State claims that the proper standard is abuse of discretion. In support, the State cites *State v. Hardy*, 83 Wn. App. 167, 176, 920 P.2d 626 (1996) (citing *State v. Strauss*, 119 Wn.2d 401, 417, 832 P.2d 78 (1992)).

Briscoeray argues, however, that the proper standard of review is de novo. He relies on a recent Division Three case, in which that court stated that "while deference is usually given to trial court rulings on evidence matters, this is not necessarily true with the excited utterance exception." *State v. Sharp*, 80 Wn. App. 457, 460, 909 P.2d 1333 (1996). The court explained, "[t]he events surrounding the utterance here occurred two months before the trial. The trial court, accordingly, is in no better position than we are to evaluate the circumstances surrounding [the witness's] utterance." *Sharp*, 80 Wn. App. at 461. The court cited a Supreme Court case, *State v. Brown*, 127 Wn.2d 749, 903 P.2d 459 (1995), in support of its conclusion that abuse of discretion was not the proper standard. *Sharp*, 80 Wn. App. at 460-61.

We decline to follow Division Three's interpretation of *Brown*. We read *Brown* to say that the trial court abused

its discretion in that case, not that the abuse of discretion standard is improper in excited utterance cases generally.

The trial court in *Brown* abused its discretion in admitting the statements at issue, because it improperly applied the excited utterance rule. In that case, the victim was allegedly raped by four men including the defendant. *Brown*, 127 Wn.2d at 752. Immediately after the rape, the victim returned to her own apartment and discussed the situation with her boyfriend, and then decided to tell police that she had been abducted into defendant's apartment. *Id.* at 753. She later recanted, testifying at trial that she voluntarily went to defendant's apartment to perform sex for money. *Id.* at 752. She lied to police because she thought they would not believe she was raped if she admitted agreeing to sex initially. *Id.* at 753. Only after making the decision to lie did she call 911 to report the rape. *Id.*

Despite the evidence of the victim's fabrication, the trial court admitted the 911 tape as an excited utterance. *Id.* at 752. The Court of Appeals affirmed, reasoning that it was within the trial court's discretion to weigh the evidence of the victim's credibility and judge the reliability of the tape. *Id.* at 757-58. The Supreme Court reversed.

The trial court in *Brown* erred in admitting the evidence, because the victim's testimony "that she had the opportunity to, and did in fact, decide to fabricate a portion of her story prior to making the 911 call renders erroneous the trial court's conclusion that the content of her call was admissible as an excited utterance." *Id.* at 759. Because the excited utterance rule is based on the premise that the speaker has no opportunity to make up a lie before making the utterance, if the speaker in fact did have that opportunity, then by definition the statement cannot be an excited utterance. In such a case, the credibility of the statement is irrelevant.

█ In contrast, in a case such as the present one, where there is substantial evidence that the witness did not have the time or opportunity to fabricate a story before making

the statements at issue, the statements may properly fall within the excited utterance exception. If the witness later recants, the trial court does not err by weighing the witness's credibility against the evidence indicating that the statements were spontaneous and reliable. This is the essence of our disagreement with Division Three in *Sharp*: because an appellate court is in no position to evaluate whether a witness is lying, we must defer to the trial court's determination.

Excited Utterance

Briscoeray argues that the statements at issue cannot be excited utterances because the evidence is insufficient to prove that Brazier made them while she was under the stress of excitement caused by the startling event. We disagree.

The excited utterance exception to the hearsay rule is found in ER 803(a)(2). The exception provides that, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the hearsay rule. ER 803(a)(2).

The exception is based on the idea that "under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control." *State v. Chapin*, 118 Wn.2d 681, 686, 826 P.2d 194 (1992) (quoting 6 JOHN HENRY WIGMORE, EVIDENCE § 1747, at 195 (1976)). The crucial question is whether the declarant was still under the influence of the event to the extent that the statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment. *State v. Sellers*, 39 Wn. App. 799, 804, 695 P.2d 1014 (1985) (citing *Johnston v. Ohls*, 76 Wn.2d 398, 406, 457 P.2d 194 (1969)).

The key to the requirement that the statements be made while under the stress of excitement caused by the startling event is spontaneity. *Chapin*, 118 Wn.2d at 688. In deter-

mining spontaneity, courts look to the amount of time that passed between the startling event and the utterance, as well as any other factors that indicate whether the witness had an opportunity to reflect on the event and fabricate a story about it. *See Chapin*, 118 Wn.2d at 688.

Here, the short amount of time that passed between the event and the utterances, as well as Brazier's emotional state during the whole of that time, suggest that her statements were spontaneous. It is undisputed that Brazier approached the guard shack within 30 to 40 seconds after a neighbor reported the abuse, and that she was crying and upset and stating, "He tried to kill me! He tried to kill me!" It is also undisputed that Heyward called 911 within minutes after Brazier contacted him. Brazier remained upset as she talked to the 911 operator. Officer Carpenter arrived while she was still on the phone and immediately asked her what had happened. Brazier was upset at times as she told him the story.

Briscoeray argues that Brazier's statements could not be excited utterances because she admitted at trial that she had concocted a lie about the incident before running to the guard shack. Briscoeray cites *State v. Brown*, 127 Wn.2d 749, 903 P.2d 459 (1995), in support of this argument.[1]

We do not view *Brown* as requiring a court to exclude evidence that otherwise qualifies as an excited utterance, merely because a witness later recants. In *Brown*, it was undisputed that the witness had time and opportunity to fabricate a lie before making the statements at issue. *See Brown*, 127 Wn.2d at 759. Here, there is substantial evidence that Brazier had insufficient opportunity to concoct a lie before making her statements to Heyward, the 911 operator, and Officer Carpenter. In addition, Brazier's relationship with Briscoeray gave her a motive to recant. The court preliminarily determined in the pretrial hearing (and apparently the jury agreed) that Brazier's recantation was

---

[1]The facts and reasoning behind the Supreme Court's decision in *Brown* are discussed in the previous section of this opinion.

not credible. The court did not abuse its discretion in admitting the evidence.

We therefore affirm the conviction.

A majority of the panel having concluded that the remainder of this opinion lacks precedential value, it is ordered that only the foregoing will be published. The balance of the opinion will be filed for public record as provided in RCW 2.06.040.

Cox and ELLINGTON, JJ., concur.

Review denied at 139 Wn.2d 1011 (1999).