[No. 23081-0-II.    Division Two.    September 24, 1999.]

THE STATE OF WASHINGTON, *Respondent*, v. JOSEPH ELMER SUNDE, *Appellant*.

*Pattie Mhoon*, for appellant (appointed counsel for appeal).

*John W. Ladenburg, Prosecuting Attorney, Michael Lee Sommerfeld, Deputy*, and *Ramsey Ramerman, Legal Intern*, for respondent.

ARMSTRONG, J. — Joseph Elmer Sunde appeals from his conviction of assault in the second degree with a deadly weapon, a violation of RCW 9A.36.021(1)(c), and the

imposition of a sentence enhancement for his use of a firearm, as required under RCW 9.94A.310 and 9.94A.370. Sunde claims error in the admission of hearsay statements as excited utterances, in the denial of his motion to vacate the sentence enhancement, in the refusal to give his proposed instruction that the firearm must be operable, and in instructing the jury on the use of a firearm rather than use of a deadly weapon in the enhancement instructions.

## FACTS

Joseph Sunde and his former wife, Suzzette Dotson, had an argument at her house the evening of October 24, 1997. The argument intensified and Dotson eventually told Sunde to leave. He replied, "If I can't have you, no one can." He then kicked Dotson's dog, took off his coat, shirt, and boots, and took a semiautomatic pistol from his coat pocket. He pointed the gun at his head. Dotson heard a click. He then pointed the gun at Dotson's head. Again she heard a click. Sunde then put the gun back in his coat pocket and left the house.

While he was outside, Dotson took the gun from Sunde's jacket and placed it into her china cabinet. When Sunde returned a few minutes later and discovered his gun missing, he became furious at Dotson. About this time, which was between 9:10 and 10:00 P.M., Leslie Livingston, a friend of Dotson's, telephoned. Dotson told Livingston that Sunde had been and was continuing to drink, that she had hid his gun, and that he was "pissed" about it. Livingston later said that Dotson was whispering during the conversation, that she sounded scared and excited and that her voice was shaky, emotional, and tearful. Livingston offered to come get her and to call Dotson's boyfriend, Tony Rossberg. Dotson accepted both offers.

Livingston arrived 10 to 15 minutes later. As she and Dotson were leaving, Sunde sat up in his truck and pursued them down the two-mile-long driveway. Dotson was scared

and "basically in hysterics" during the chase. When they got to the main road, Sunde turned away, but Dotson asked Livingston to take her back to her house because she was afraid that Sunde would damage it. As they arrived, Sunde pulled up behind them, blocking their exit. After Dotson promised that she would return in 15 or 20 minutes, Sunde let them leave. Livingston later described Dotson as "scared the whole time[;] I mean, she was scared." As they drove away, Dotson told Livingston about her earlier argument, his kicking the dog, and that he pointed the gun at himself and her, pulling the trigger both times.

Livingston took her to the Key Center Tavern, arriving at about 9:30 P.M., when they called the police. Minutes later, Sunde arrived. After a brief discussion with Dotson, he sped out of the driveway, spinning gravel as he left. Livingston described Dotson as looking scared and shaky during her encounter with Sunde.

Twenty minutes later, Tony Rossberg arrived. Rossberg, who had known Dotson for 14 years and considered her a close friend, described her as shaken up, stressed out, nervous, and scared. Upon seeing Rossberg, Dotson clutched him, broke into tears, and described how Sunde had pointed a gun at her head and pulled the trigger. She gave the gun to Rossberg, who removed the clip and a bullet from the chamber. He eventually turned it over to the police.

Shortly thereafter, Sunde returned to the tavern. He pulled up in his truck, opened the passenger door, and screamed at Dotson to come over. Dotson approached Sunde nervously. When Rossberg walked up behind her, Sunde sped off, squealing his tires.

But Sunde returned. When Dotson tried to talk with him, Sunde grabbed her by the back of the neck and tried to kiss her. He told her, "It's time to come home." When she refused, he said, "It's time to leave or you can go the hard way." When Dotson refused again, he said, "If you don't come home with me I will kill you and that fucker [Rossberg]." Sunde left when the bartender came out and told him to go.

At 10:28 P.M., three Pierce County deputy sheriffs arrived. Deputy Plummer interviewed Dotson. He described her as very emotional and upset, crying and sobbing. She expressed fear that Sunde would return to hurt her. She then told Plummer about how Sunde had pointed a gun at her head and pulled the trigger.

The deputies stopped and arrested Sunde after he drove past the tavern and Dotson alerted them to his presence. Sunde admitted to the officers that he had been drinking, that he and Dotson had had a fight, and that they had been living together the past month. He denied that he had pointed a gun at Dotson and claimed that she was lying.

Dotson was escorted home by the deputies. There they discovered a noose hanging from a tree with the loose end of the rope tied to the bumper of Sunde's car.

Dotson and Rossberg gave written statements to the police. At trial, Dotson was a reluctant witness. She testified that during their argument that evening, Sunde pointed a gun at his own head but she did not remember him pointing it at her and she did not remember his threat to kill her and Rossberg. She was compelled under ER 803(a)(5) to read her written statement to the jury. It provided:

> Joe came to my home and was upset because I didn't come home last night and was with my girlfriend, Leslie. We argued and he pulled out a small gun and he started to pull the trigger and make it click at himself and then at me. My friend called and I asked her to come and get me. She arrived and he was sleeping in his truck. I got into her car and he got out of the truck, wanting to get into the house. So he wouldn't wreck the house, I threw him a house key and left. And then we saw him following us at a high rate of speed, but he turned off the other way so we turned around to turn on the alarm. But when we got into the driveway, he came back and blocked her car and us in. I got out and promised him I would be right back. I went to the nearest pay phone and called 911. And then he showed up and said he was going to kill me and my boyfriend.

The trial court allowed Rossberg, Livingston, and Plummer

to testify as to Dotson's statements made to them under the excited utterance exception to the hearsay exclusion.

Sunde testified at trial. He acknowledged most of the events as described above, including owning the gun and having fired it hundreds of times. But he denied having the gun that evening, claiming that he had left it with Dotson when they separated in February 1997. And he denied making threats or being suicidal.

Glen Glover, an investigator, testified that the bullet recovered fit into the gun. He also testified that because the gun was a single action .22 caliber, one could not point the gun, pull the trigger and cause it to click, and then pull the trigger again and cause it to click unless the slide mechanism is manually drawn back. He acknowledged that one could repeatedly pull the trigger without firing the gun if the magazine clip was not fully inserted and the safety was on and that this would create a quiet metallic sound. But he said, it would not click.[1] When asked whether the gun was operable, he said he could not answer yes or no unless he had test fired it.

The jury found Sunde guilty as charged and that he was armed with a firearm at the time. He now appeals.

### ANALYSIS
#### Excited Utterances

Sunde first argues that the trial court erred in admitting statements Dotson made to Leslie Livingston, Tony Rossberg, and Officer Plummer because Dotson had time to reflect before she made them. Sunde urges this court to conduct a de novo review of the evidentiary ruling, citing *State v. Sharp*, 80 Wn. App. 457, 460, 909 P.2d 1333 (1996)

---

[1]He testified:

> Well, I would concede that there is a very small noise made when the trigger's pulled, even on safe. But it would have to be a very, very quiet room with someone listening very closely versus the gun with the hammer falling and the action going through what it typically would from here to—me to you, you'd be able to hear that, versus you would not be able to hear that from there if, indeed, it did not fire.

(statements made 30 to 40 minutes after the events did not qualify as excited utterances because the victim had a period of calmness). *But see State v. Briscoeray*, 95 Wn. App. 167, 171-73, 974 P.2d 912 (1999) (abuse of discretion standard applies; *Sharp* misread *State v. Brown*, 127 Wn.2d 749, 903 P.2d 459 (1995)).

We agree with *Briscoeray* that *Brown* did not change the standard of review for excited utterances. As the *Briscoeray* court stated:

> Because the excited utterance rule is based on the premise that the speaker has no opportunity to lie before making the utterance, if the speaker in fact did have the opportunity, then by definition the statement cannot be an excited utterance. In such a case, the credibility of the statement is irrelevant.

*Briscoeray*, 95 Wn. App. at 172.

ER 803(a)(2) allows the admission of excited utterances as an exception to the rule excluding hearsay statements. An excited utterance is "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *See State v. Chapin*, 118 Wn.2d 681, 686, 826 P.2d 194 (1992) (proof of three closely related requirements needed to qualify as excited utterance: (1) a startling event or condition must have occurred; (2) the statement must have been made while the declarant was under the stress of excitement caused by the event or condition; and (3) the statement must relate to the startling event or condition).

Sunde's claim of error is predicated on the second requirement. He argues that Dotson had time to reflect before making her statements and, therefore, they are not excited utterances. *Id.* at 686. But the facts as set out above show that Dotson was in a state of excitement from the time Sunde first pulled out his weapon until the police arrested him. Throughout the two-hour period, Dotson was scared, shaking and nervous. Further, there was no evidence that she had an opportunity to fabricate a lie as in *Brown*. We find no abuse of discretion as substantial

evidence supports the trial court's finding that she was under the excitement of the event when she made her disclosures.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

BRIDGEWATER, C.J., and HUNT, J., concur.