IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 81803-1-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| DANIEL DENNIS DAY, JR., | |
| Appellant. | |

CHUN, J. — A jury found Daniel Day guilty of robbery in the first degree while on community custody. Day appeals, arguing the trial court erred in admitting Britney Criss's statements under the excited utterance exception to the hearsay rule. As discussed below, because the trial court acted within its discretion, we affirm.

## I. BACKGROUND

Criss and Jerry John Phillips were having opiate withdrawals. Using Criss's phone, Phillips texted Day about buying Percocet from him. Criss withdrew cash to buy the drugs.

Criss and Phillips drove to Rotary Park in Everett, Washington, to meet Day. At 4:21 p.m., Phillips texted Day, "Im here." Eight minutes later, Day responded, "I'm almost their, I'm in my little gray 4 door car, what r u driving." At 4:35 p.m., Phillips responded, "Grey hyundia."

Citations and pin cites are based on the Westlaw online version of the cited material.

While at the park, Criss and Phillips went for a walk. But they got into an argument and Criss walked "pretty far" ahead of Phillips. While Criss was standing alone, a "silver four-door sedan" pulled up to her. Criss testified, "The driver had his window down, and he pulled a gun, and he said, 'Give me your money,' and next thing I know [sic] I was just throwing my money and just wanting it to be over with." She testified that she was scared and "reached into [her] purse and grabbed the money, and . . . tossed it." She also testified that the gun "was all black" and had a "long barrel."

From a distance, Phillips saw a silver car speed away from Criss. Criss testified that, "as soon as he pulled off, . . . Jerry was coming up. I told Jerry what happened. I called 911." She said that she called 911 "[m]aybe two or three minutes" after the driver left. She told the 911 dispatcher that someone robbed her about five minutes before she called them. Criss also testified that at that moment she was, "Startled. Upset. Scared." Phillips testified that Criss was "freaked out" and "crying."

About five minutes after Criss's 911 call, at 5:15 p.m., Everett police officer Alex Soderstrom responded to a 911 dispatch to Rotary Park. Soderstrom testified that Criss was "shaking, nervous. She was very upset." Soderstrom asked Criss to describe the suspect and the incident. Soderstrom testified that Criss "said the car pulled up to her, and there was a lone person in the car, just the driver, a white man with short blond hair. He pointed a black pistol, semiautomatic pistol at her chest and demanded her money." Soderstrom also testified that Criss said the first three letters of the license plate were "BNL."

2

Everett police officer Jason MacDonald arrived at the scene at 5:25 p.m. He testified that he interviewed Criss for about 30 minutes and the entire time "it was difficult for her to speak in complete sentences, she was breathing heavily, and . . . she was crying kind of throughout my interview." He testified that "multiple times I saw her kind of break eye contact with me and look over her shoulder, . . . checking her surroundings." MacDonald testified, "I took that to—to mean that she was fearful and was checking to see if the suspect was coming back or still in the area."

MacDonald asked Criss if she was in the park for a drug-related reason, and she said, "No." He then asked if Criss had "arranged to meet somebody at that location to buy or sell drugs," and she said "no." He explained that he was not trying to get Criss in trouble, but that he needed to know what happened. Criss responded by saying she had not agreed to meet anyone.

While MacDonald talked with Criss, Soderstrom drove "[a]t least a mile" to an area where "[t]here are some hidden spots along the river where you can park and not be seen from the road." There, he found Day, "a white male in a black sweatshirt and black pants standing alongside" a silver Hyundai with a license plate starting with "BNL." Soderstrom testified that Day and the car matched Criss's description.

Soderstrom testified that after Day saw his marked patrol vehicle, Day got into his car and drove away. Day drove the speed limit and used his turn signals. Soderstrom and several other officers followed the car. Soderstrom activated his patrol vehicle's lights and about three minutes later, Day parked next to an

"embankment and jumped out of the car and ran." Other officers ran after Day, and deployed canine and drone searches. Officers found Day laying on his stomach in bushes and arrested him. They found cash in his pockets and in a small black pouch in his possession.

Meanwhile, Soderstrom secured Day's car. Officers executed a search warrant and found a BB gun in the car.

The State charged Day with robbery in the first degree committed while on community custody.

During pretrial motions, the State moved to admit Criss's statements to the 911 dispatcher and to MacDonald under the excited utterance exception to the hearsay rule. Day moved to suppress the statements as inadmissible hearsay. Regarding Criss's statements to the 911 dispatcher, the trial court said, "I'm going to reserve this motion. . . . I would have to hear the 911 tape at some point." During a hearing on motions in limine, the court listened to the 911 recording. Day objected to its admission, arguing it did not qualify under the excited utterance exception to the hearsay rule. The State argued:

> Here the question is whether she's still under the excitement of the event that had just occurred, and I think the answer to that is a resounding yes. We hear her vocal tone, heavy breathing, difficulty in communicating complete sentences, which suggests she's under the stress of the incident at the time she placed the call.
>
> So I think there is certainly sufficient foundation for the Court to determine that the excited utterance exception applies to the hearsay rule and to permit the State to admit this 911 call.

The trial court determined as follows:

> I've been listening to the tape of the 911 call. It is clear to this Court that the caller was still quite distraught during that call. On multiple occasions her voice broke as she tried to narrate what was

4

going on. She appeared to sob on at least one occasion. She reported that she had just been robbed about five minutes ago at gunpoint.

It is clear to this Court that at the time the call was made, she was under the stress of the excitement of the event of which the statements were made.

The court admitted the 911 recording over Day's objection.

As for Criss's statements to MacDonald, the court decided to reserve ruling on the issue until before opening statements when the parties could voir dire MacDonald. During voir dire, MacDonald testified,

I was speaking with her, with Ms. Criss, more than 30 minutes after the incident reportedly occurred, she was still crying, still breathing heavily, still difficult for her to speak in complete sentences. It looked to me like she was upset and it was -- she was kind of still filled with -- whether it's adrenaline or emotions or just kind of the situation that just happened.

The State asked MacDonald if Criss "appear[ed] like she was still under the stress of what had just happened" when he interviewed her at the scene. MacDonald responded, "Yes." MacDonald explained that he arrived at the scene within nine minutes from receiving the dispatch, which was "within 15 minutes" from when the incident occurred. Defense counsel asked MacDonald, if during his interview, it became easier for Criss to respond to his questions. MacDonald responded, "I don't remember a point in which she wasn't crying."

Defense counsel objected to the admission of MacDonald's testimony:

Well, I was making my arguments in regards to the 911 call. If the Court remembers those arguments, they are effectively the same arguments, in terms of the excited utterance. These are in response to questions. She's able to respond to these questions. It sounds like . . . the scene had been secured for Ms. Criss. There were multiple officers on scene, and this was a lengthy conversation from 30 minutes to approximately a full hour of the actual contact with Officer MacDonald.

5

Over that objection, the court admitted MacDonald's testimony under the excited utterance exception to the hearsay rule. It determined the testimony qualified as an excited utterance because Criss made her statements to Officer MacDonald when she "was still under the stress of the excitement of the event that had just occurred. She made statements relating to the incident that had occurred."

During trial, MacDonald testified that "as I was talking to [Criss], . . . it looked to me is [sic] she was checking her surroundings." On cross-examination, defense counsel asked MacDonald about his interview with Criss at the scene:

> Q. And so you asked Ms. Criss specifically whether this is something that involved drugs; correct?
>
> A. Yeah, I did.
>
> Q. And her response was, "No." Is that right?
>
> A. That is.
>
> Q. Okay. And that's because -- so you found in speaking with Ms. Criss that she did not, in fact, live in Everett; is that right?
>
> A. Correct.
>
> Q. Okay. And you found it maybe a little odd that she was at this park on a Thursday; is that right?
>
> A. Yeah, it was something that I took notice of.
>
> Q. Okay. So you asked her once if this involved drugs, and she said no. And you asked her a second time specifically whether she had arranged to meet somebody at that location to buy or sell drugs; correct?
>
> A. Yeah.
>
> Q. And her response to that was no; right?
>
> A. Yeah.
>
> Q. And you even went an extra step further, and you explained to her that you weren't trying to get her into trouble; that she could still be a victim, but you needed to know the circumstances; correct?
>
> A. Yeah.

6

Q.  You told her that?  Okay.

And she responded to that, and she said that she had not agreed to meet with anybody; is that correct?

A.  Correct.

Q.  Okay. And that she did not know the suspect? She said that; correct?

A.  Correct.

Q.  Okay.  And she said that the incident, in fact had nothing to do with drugs.

A.  Correct.

At trial, Criss testified that she went to the park to buy drugs.  The State asked Criss, "Were you afraid to tell them that you were there to buy drugs?"  She responded, "Yeah."

The jury found Day guilty of robbery in the first degree while on community custody.

Day appeals.

## II.  ANALYSIS

Day says the trial court erred in admitting Criss's statements to the 911 dispatcher and MacDonald as excited utterances because she had 40 minutes between the robbery and those statements to fabricate her story.  The State responds that Criss initiated the 911 call and answered MacDonald's questions minutes after the robbery and was still under the stress and excitement from the event.  We conclude that the trial court acted within its discretion.

We review evidentiary decisions, including a trial court's application of the excited utterance exception to the hearsay rule, for abuse of discretion.  State v. Rodriquez, 187 Wn. App. 922, 939, 352 P.3d 200 (2015).  "Abuse of discretion

occurs when the trial court's ruling is manifestly unreasonable or based on untenable grounds or reasons." Id.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Generally, hearsay is inadmissible. ER 802.

An "excited utterance" is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition," and may be admissible as an exception to the hearsay rule. ER 803(a)(2). "'A statement qualifies as an excited utterance if (1) a startling event occurred, (2) the declarant made the statement while under the stress or excitement of the event, and (3) the statement relates to the event.'" Rodriquez, 187 Wn. App. at 938 (quoting State v. Magers, 164 Wn.2d 174, 187–88, 189 P.3d 126 (2008)).

"Often, the key determination is whether the statement was made while the declarant was still under the influence of the event to the extent that the statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment." State v. Woods, 143 Wn.2d 561, 597, 23 P.3d 1046 (2001). "[C]ourts look to the amount of time that passed between the startling event and the utterance, as well as any other factors that indicate whether the witness had an opportunity to reflect on the event and fabricate a story about it." State v. Briscoeray, 95 Wn. App. 167, 174, 974 P.2d 912 (1999).

8

*Passage of Time*

Day says Criss had time to fabricate her story, so her statements were not admissible under the excited utterance exception to the hearsay rule. Day says about 40 minutes passed between the robbery and when Criss called 911 and when Criss spoke to MacDonald. The State responds that only a few minutes passed between the incident and the 911 call, and MacDonald spoke to Criss about nine minutes after receiving the 911 dispatch.

The police recovered Day's phone and executed a search warrant to obtain text messages. The last text message Day received from Criss's phone was at 4:35 p.m. Criss testified that she called 911 right after Day robbed her, and she told the 911 dispatcher that someone robbed her about five minutes before she called 911. McDonald testified to responding to the scene at 5:25 p.m., which was about nine minutes after receiving the 911 dispatch. If Criss called 911 five minutes after the robbery and MacDonald arrived nine minutes after the dispatch, the robbery took place around 5:05 p.m. While Day points to the nearly 40 minutes that passed between the last text message he received at 4:35 p.m. and Criss's 911 call around 5:05 p.m., he has offered no evidence that the robbery took place at 4:35 p.m. And any such evidence would conflict with the 4:35 p.m. text, which indicated that Day and Criss had not yet met up. Nor does Day point to evidence that the robbery took place just after the text.

*Under Stress of Incident*

Moreover, in State v. Thomas, 150 Wn.2d 821, 855, 83 P.3d 970 (2004), our Supreme Court held that a witness's delayed statement is not necessarily precluded as an excited utterance if the witness made that statement while still under the continued stress of the incident. It determined in that case, that although the witness gave his statement 90 minutes after the incident, the statement was still admissible as an excited utterance because the witness made the statement when he "was soaked in the victim's blood" and "visibly shaken, appearing 'scared' and 'frightened' when he made the statement." Id. Thus, we consider whether other evidence supports the trial court's finding that Criss was still under the stress and excitement from the incident when she made both the statements to the 911 dispatcher and MacDonald.

As the trial court noted, during the 911 call, "On multiple occasions [Criss's] voice broke as she tried to narrate what was going on. She appeared to sob on at least one occasion." Criss told the dispatcher that she was not hurt but startled. She said, "I've been watching the road in case he does turn back." In Rodriquez, the defendant contended that the trial court abused its discretion in admitting a 911 recording because the declarant was not under the continued stress of excitement when she called 911. 187 Wn. App. at 938. Division Three of this court disagreed, because the victim's "ongoing state of excited fear was evident throughout the 911 call" when she repeatedly told the dispatcher she was scared and begged the dispatcher to send help soon. Id. Similarly, Criss's statements to the dispatcher show that she remained under the stress of the

10

excitement from the robbery because she said she was startled and was keeping watch in the event that Day returned.

As for Criss's statement to MacDonald, he testified that she cried continuously during his 30-minute interview and it was difficult for her to speak. He testified that Criss kept moving her eyes and looking over her shoulder as if she was worried that Day would return. When the State asked MacDonald if Criss "appear[ed] like she was still under the stress of what had just happened," he said, "Yes."

*Fabrication*

Day says that because Criss lied to the 911 dispatcher and MacDonald about her reason for being in the park, her statements were not excited utterances. Even though Criss went to the park to buy drugs from Day, she told the 911 dispatcher that she "came down here to talk with my boyfriend" and that she did not know who robbed her. And Criss told MacDonald that she was not at the park to buy drugs.

In Woods, our Supreme Court determined the trial court did not abuse its discretion when it admitted the victim's statements to her father even though she omitted that she had been out drinking and wanted to buy drugs from the suspect. 143 Wn.2d at 600. In so ruling, the court distinguished State v. Brown, 127 Wn.2d 749, 757–59, 903 P.2d 459 (1995). In Brown, our Supreme Court determined the trial court abused its discretion in admitting a 911 recording under the excited utterance exception because the victim fabricated a story that the defendant abducted and then raped her. Id. at 753. There, the victim fabricated

11

the story because she feared the police would not believe that the defendant raped her if she told them the truth—that she was a sex worker and willingly went to the defendant's apartment.  Id.  The court in Woods said, "The alleged victim in Brown affirmatively hatched a story to bolster her own credibility," whereas the victim in Woods "merely failed to relate information about certain events in the evening."  Woods, 143 Wn.2d at 600.  It determined, "The fact that Jade failed to provide details about the previous night, . . . especially after being brutalized in such an egregious manner, is not comparable to the fabrication of fanciful statements that we saw in Brown."  Id.  Because the victim in Woods did not fabricate a story, the trial court did not abuse its discretion by admitting her statement to her father as an excited utterance.  Id.

Criss's statements resemble the victim's statement to her father in Woods.  Criss told the 911 dispatcher that she went to the park to be with Phillips, but omitted the fact that they went to the park to purchase drugs.  Unlike Brown, while Criss told MacDonald that she did not go to the park to purchase drugs, she did not appear to fabricate a story about how Day robbed her.

Given the foregoing—including the evidence showing only a brief passage of time between the incident and Criss's statements and the evidence showing that she was still under the stress of the incident—we conclude that the trial court acted within its discretion in admitting the statements as excited utterances.  That Criss omitted the drug-related information does not change our view; it appears

12

from the evidence that she did not fabricate a story about how the crime was committed.[1]

    We affirm.

_Chun, J._

WE CONCUR:

_Smith, J._         _Dwyer, J._

---

[1] Day also says the trial court's admission of Criss's statements to the 911 dispatcher and MacDonald were prejudicial and materially affected the outcome of the trial. Because we conclude that the trial court acted within its discretion in admitting the evidence, we do not reach this claim.