[No. 45635-1-I. Division One. August 13, 2001.]

THE STATE OF WASHINGTON, *Respondent*, v. EDDIE L.
LAWRENCE, *Appellant*.

228

*James R. Dixon* and *Catherine E. Glinski* (of *Nielsen, Broman & Associates, P.L.L.C.*), for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Lee D. Yates, Senior Deputy*, for respondent.

APPELWICK, J. — Eddie Lawrence appeals his conviction of second degree rape. He claims he was not competent to stand trial, that the trial court improperly admitted hearsay statements, that the prosecutor's misconduct during closing argument denied him a fair trial, and that the persistent offender law is unconstitutional. We affirm.

## FACTS

Diane was beaten and raped on October 4, 1997. Diane and her boyfriend, Leonard Stubbs, were in downtown Seattle on the day of the incident. After drinking a couple of beers, they had an argument. Diane split up with Stubbs, intending to meet him later that night at Nightwatch, an organization that helps homeless people find shelter for the night. Diane spent most of the day in Belltown. She then bought a beer and started walking to Nightwatch. As she walked along Western Avenue toward Nightwatch, she saw Eddie Lawrence underneath the Alaska Way Viaduct. Diane did not know Lawrence.

Lawrence asked Diane if she had a cigarette. Diane let him roll a cigarette from her tobacco. He then asked for a drink of her beer, and she gave him the bottle. He asked her where she was going. She replied that she was going to Nightwatch to meet her boyfriend. Lawrence asked if she wanted to "party," saying he would buy rock cocaine. She declined, and reiterated that she was going to Nightwatch to meet her boyfriend.

When Diane started to leave, Lawrence grabbed her ponytail and said, "[y]ou are not going anywhere, bitch;

[w]e're partying." She repeatedly screamed for help as he dragged her under the viaduct. Lawrence said, "shut up" and slammed her face against the cement. He then dragged her to a cement wall as she screamed, "[h]elp, I'm being raped." Lawrence ripped at her clothing, and choked her to get her to stop screaming. In an attempt to get Lawrence to stop, Diane said, "[f]uck me, I've got AIDS." There were blankets spread out under the viaduct. Lawrence pulled down Diane's pants and held her down. He got on top of Diane, held her by the throat, and forced sexual intercourse. When Lawrence finished, Diane began to leave. Lawrence then apologized to Diane for his actions.

Diane walked about three to four blocks to Nightwatch. When she walked in, she met a volunteer screener. Diane told the screener that she had just been raped. Diane did not want the volunteer to call the police. Diane had a warrant for her arrest, and was concerned she would be taken to jail.

Stubbs was already at Nightwatch. He saw Diane across the room, crying and upset. Stubbs walked over to Diane and she told him that she had just been raped, and told him the details of the assault.

Stubbs and the screener encouraged Diane to call the police. She initially hesitated because she had an outstanding warrant for her arrest, but later agreed to call 9-1-1. The police and an ambulance arrived at Nightwatch. The police observed a lump on Diane's forehead, and a bruise on her neck. The medics transported her to Harborview Medical Center.

A few weeks after the rape, Stubbs pointed Lawrence out at a downtown establishment as a possible suspect in the case. Diane immediately recognized Lawrence as the person who had raped her. Stubbs called the police, and he was arrested.

The State charged Lawrence with rape in the second degree. Lawrence denied the charge, claiming that it was consensual. He also raised the defense of diminished capac-

ity. A jury disbelieved him and found him guilty as charged. The sentencing court found that among Lawrence's prior sex crime convictions, a 1974 New York conviction for attempted rape in the first degree was comparable to attempted rape in the second degree in Washington. Accordingly, the court imposed a sentence of life in prison under Washington's "Two Strikes" law.

## ANALYSIS

### I. COMPETENCY TO STAND TRIAL

After his arrest, the trial court committed Lawrence to Western State Hospital for an evaluation to determine whether he was competent to stand trial. The trial court later conducted a competency hearing. Three experts testified. The experts agreed that Lawrence has an IQ of 60, which classifies him as mildly retarded. The experts disagreed, however, whether Lawrence's limited mental capacity together with a slow thought process prevented him from having the competence to stand trial. The experts noticed "latencies," or long periods of time in which Lawrence did not respond to questions. The latencies would sometimes last as long as 10 minutes. While the experts noticed that Lawrence took a long time to answer questions, his latency of response depended on the topic being discussed. For instance, there was a significant delayed response when Lawrence described that he had been sexually abused at a young age. Most of Lawrence's responses, however, were not delayed.

The trial court agreed with the State's experts, and found that Lawrence possessed the requisite degree of competence to stand trial. Lawrence assigns error to this finding.

It is fundamental that no "incompetent person may be tried, convicted, or sentenced for the commission of an offense so long as such incapacity continues." RCW 10.77.050. Indeed, " 'the conviction of an accused while he is legally incompetent violates his constitutional right to a fair trial under the Fourteenth Amendment's due process

clause.' " *State v. Minnix*, 63 Wn. App. 494, 497, 820 P.2d 956 (1991) (quoting *State v. Wicklund*, 96 Wn.2d 798, 800, 638 P.2d 1241 (1982)). A defendant is competent if he has the capacity to understand the nature of the proceedings against him and to assist in his own defense. *Wicklund*, 96 Wn.2d at 800. In reviewing a trial court's decision on competency, we grant the trial court great deference. *See State v. Dodd*, 70 Wn.2d 513, 514, 424 P.2d 302 (1967). We will not reverse the trial court unless we find that the court abused its discretion. *State v. Ortiz*, 104 Wn.2d 479, 482, 706 P.2d 1069 (1985).

In this State, our courts have upheld a trial court's finding of competency to stand trial even where the defendant has a low IQ, rendering the defendant mildly retarded. *See Minnix*, 63 Wn. App. at 499 (IQ of 49 to 67); *Ortiz*, 104 Wn.2d at 482 (IQ of 49 to 59). Lawrence claims that his case is different than a case involving only a developmental disability. He acknowledges that he "did demonstrate a basic, minimal understanding of the charges against him, the nature of the proceedings, and the parties involved. The evidence showed, however, that he was incapable of assisting his attorney, because his mental impairment and response latencies made communication during trial impossible."

The record on appeal does not support the factual finding that Lawrence seeks. Dr. Joanne Ito, a psychologist from Western State Hospital, found that while it occasionally took Lawrence a considerable time to answer questions, Lawrence had the capacity to respond. She also found that Lawrence was also fully aware of his own self-interest, and was able to follow his attorney's directives.

Lawrence's own expert's testimony also supports the trial court's finding of competency. Dr. John Petrich agreed that Lawrence understood the charges against him, was able to give a detailed factual account of the State's allegations, and was able to tell Dr. Petrich his version of the events, namely that he and the victim had consensual sex.

■ The fact that Lawrence was unable to respond

promptly, or that he had a slow thought process, does not prove that he was unable to comprehend what was being said, or unable to communicate his thoughts to counsel. The trial court accommodated Lawrence's slow thought process by allowing longer periods of consultations between Lawrence and his counsel. Based on Lawrence's ability to articulate to the experts a description of the allegations and his version of what happened on the night of the alleged rape, we conclude that he had the ability to assist his counsel in a defense. The trial court did not abuse its discretion in finding that Lawrence was competent to stand trial.

## II. EXCITED UTTERANCES

■ Lawrence asserts that Stubbs' testimony about the statements that Diane had made to him shortly after the rape was inadmissible hearsay. He argues, as he did below, that these statements were not excited utterances because Diane reflected on her arrest warrant shortly before she made her statements to Stubbs. Because Diane resisted calling the police when the screener at Nightwatch encouraged her to, Lawrence claims that Diane had the opportunity and ability to fabricate her story if she were so inclined. We review the trial court's decision to admit the testimony under the abuse of discretion standard. *State v. Briscoeray*, 95 Wn. App. 167, 171-72, 974 P.2d 912, *review denied*, 139 Wn.2d 1011 (1999). Abuse of discretion occurs when the trial court's decision is arbitrary or rests on untenable grounds or untenable reasons. *State v. McDonald*, 138 Wn.2d 680, 696, 981 P.2d 443 (1999).

■ Hearsay is generally inadmissible. ER 802; *State v. Chapin*, 118 Wn.2d 681, 685, 826 P.2d 194 (1992). But there is an exception for excited utterances. ER 803(a)(2).

This exception is based on the idea that "under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control." The utterance of a person in such a state is believed to be "a spontaneous and sincere response to the actual sensations and perceptions already produced by the

external shock," rather than an expression based on reflection or self-interest.

*Chapin*, 118 Wn.2d at 686 (quoting 6 JOHN HENRY WIGMORE, EVIDENCE § 1747, at 195 (James H. Chadbourn ed., rev. ed. 1976)). Three requirements must be met for hearsay to qualify as an excited utterance: (1) a startling event or condition must have occurred, (2) the statement must have been made while the declarant was still under the stress of the startling event or conditions, and (3) the statement must relate to the startling event or condition. *State v. Hardy*, 133 Wn.2d 701, 714, 946 P.2d 1175 (1997).

▌ The critical issue here is whether or not the statement satisfies the second requirement, which requires the declarant to be under the stress of the excitement of the startling event when the statement is made. The second element "constitutes the essence of the rule" and "[t]he key to the second element is spontaneity." *Chapin*, 118 Wn.2d at 687-88.

> Ideally, the utterance should be made contemporaneously with or soon after the startling event giving rise to it. This is because as the time between the event and the statement lengthens, the opportunity for reflective thought arises and the danger of fabrication increases. The longer the time interval, the greater the need for proof that the declarant did not actually engage in reflective thought.

*Chapin*, 118 Wn.2d at 688 (citations omitted).

Lawrence cites *State v. Brown*, 127 Wn.2d 749, 759, 903 P.2d 459 (1995), claiming that the present situation is similar to that case. In *Brown*, the declarant was raped after she willingly went to the defendant's neighboring apartment. After the rape, she went home and told her boyfriend that she did not think the police would believe her because she went willingly and the police knew she was a prostitute. After discussing the situation with her boyfriend, she decided to call 9-1-1 and tell the police that she had been abducted, that the defendant threatened her with a knife and attempted to shoot her with a gun. At trial, however, the victim admitted her fabrication and admitted

that she had not seen a knife during the rape. The trial court nonetheless found that her statements qualified as excited utterances. *Brown*, 127 Wn.2d at 753. On appeal, the Supreme Court reversed the trial court, concluding that the victim's own trial testimony made it apparent that "she had the opportunity to, and did in fact, decide to fabricate a portion of her story prior to making the 911 call." *Brown*, 127 Wn.2d at 759.

In *Chapin*, the Supreme Court found numerous factors that raised doubts as to whether the declarant's statement was truly a spontaneous and trustworthy response to a startling event. The declarant in that case was a 69-year-old patient at a nursing home. The declarant had Alzheimer's disease and his "mental deterioration was severe." *Chapin*, 118 Wn.2d at 690. The State charged Chapin, a nurse's aide at the nursing home, with second degree rape. A key part of the evidence upon which the jury relied in convicting Chapin was the patient's statement to his wife that Chapin "[r]aped me." The alleged rape occurred within a day or so of the patient's statement. The patient had been calm earlier in the day, but became extremely angry when he saw Chapin. At one point, the patient began to cry. In response to his wife's question as to why the patient did not like Chapin, the patient said, "[r]aped me." *Chapin*, 118 Wn.2d at 684. A nurse took the patient to the restroom and found that his rectal area was red, irritated, and swollen. No other physical examination of any kind was done in connection with the alleged rape.

On appeal, the Supreme Court reversed the trial court, concluding that because of the time lapse, the patient was unlikely to have still been in an excited state. The patient had been calm earlier in the day and had engaged in his usual activities. *Chapin*, 118 Wn.2d at 689. The Court also noted that the patient's wife had calmed him down before questioning why he disliked Chapin, and said that the patient's statement in response to a question was an additional factor that raised doubts as to the spontaneity and trustworthiness of the statement. *Chapin*, 118 Wn.2d

at 690. The Court also found factors: that the patient "was confused, prone to confabulation, subject to persecutory delusions, hostile to those who tried to direct his behavior, and hostile in particular to male attendants." *Chapin*, 118 Wn.2d at 691. Based on the foregoing, the Court concluded that the trial court erred in admitting the patient's statement under the excited utterance exception. *Chapin*, 118 Wn.2d at 691.

 Contrary to Lawrence's assertion, this case is not like *Brown*. Unlike the declarant in *Brown*, Diane did not admit to fabricating the facts about the rape, nor did she contemplate fabricating the incident. We also fail to find facts similar to those in *Chapin*. Although Diane's brief hesitation in calling the police raises a tenuous doubt as to her excited state of mind, this factor alone is not conclusive. A victim's initial refusal to call the police does not necessarily preclude admission of any preceding statement as an excited utterance. The determination of spontaneity is time sensitive, and many factors can raise serious doubts as to the declarant's genuine state of mind. The real question is whether Diane was still under the stress earlier produced causing her to exclaim spontaneously, not whether she had unrelated concerns which gave her second thoughts about notifying police after making the statement.

There is no doubt that just 10 to 15 minutes before Diane spoke to Stubbs, a startling event had occurred. When Diane entered Nightwatch, she was shaking and sobbing. At first, Diane would not say what was wrong. Instead, she continued to sob. She eventually told Stubbs that she was raped. Stubbs testified that he had seen Diane cry as hard only once before, when her sister died. The fact that she briefly hesitated before calling the police does not show that she lacked the requisite excitement at the time she told Stubbs about the details of the rape. Any opportunity to reflect on her own self-interest was made during a time of severe stress. Diane's hearsay statements about the rape were properly admitted under the excited utterance exception.

III. PROSECUTORIAL MISCONDUCT

Lawrence claims that two comments by the prosecutor in final argument constituted misconduct. On one occasion, the prosecutor argued facts that were not in evidence. The other challenged remark of the prosecutor related to the burden of proof.

 In closing argument, the prosecuting attorney has wide latitude in drawing and expressing reasonable inferences from the evidence. *State v. Hoffman*, 116 Wn.2d 51, 94-95, 804 P.2d 577 (1991). When improper argument is charged, the defense bears the burden of establishing the impropriety of the prosecuting attorney's comments, as well as their prejudicial effect. *State v. Russell*, 125 Wn.2d 24, 85, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995). To show prejudice, the defendant must demonstrate there is a substantial likelihood that misconduct affected the jury's verdict. *State v. Pirtle*, 127 Wn.2d 628, 672, 904 P.2d 245 (1995), *cert. denied*, 518 U.S. 1026 (1996). If there was no objection to the prosecutor's argument, the burden upon the defendant is even greater. A defendant is deemed to have waived any claim of error unless the remark is so flagrant and ill-intentioned that it caused an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury. *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997). Allegedly improper argument should be reviewed in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given. *Brown*, 132 Wn.2d at 561.

At one point in final argument, the prosecutor discussed his recollection of the testimony of Diane regarding her statements to Lawrence prior to the rape. The prosecutor said that Diane told Lawrence, "Go ahead and fuck me, I have got AIDS." Thereafter, the prosecutor told the jury, without objection, that Lawrence replied "I don't care, bitch, I have got to die sometime." In context, the prosecutor said:

> But more importantly, members of the jury, more impor-
> tantly, when she turns to leave and he grabs her by the

ponytail, when she starts yelling out "Help" and he grabs her by the throat, and you saw that the doctor found abrasions on her throat where he had choked her, Mr. Lawrence takes a measured response. He responds to any attempts to prevent him from raping Ms. Cunningham. She starts to yell, he chokes her. Shut her up. She tries to resist, he bashes her head into a concrete piling to knock her down. He throws her down.

And when she is defenseless and feeling like there is nothing she can do, she says to him, "Go ahead and fuck me. I have got AIDS." The last desperate threat of a desperate woman who has found that she is being overpowered. "Go ahead and fuck me. I have got AIDS." What does Mr. Lawrence say in response? "I don't care, bitch, I have got to die sometime."

I ask you this, doesn't it take at least some ability to think, to realize when she makes a threat that she's got AIDS that what she is really saying is, "Go ahead, have sexual intercourse with me. If you do, you will die. Because I have got a disease that will kill you."

Mr. Lawrence understood that. Mr. Lawrence said, "I don't care. I have got to die some day." He knew exactly, exactly what she was saying, and that is a man who, while very angry and acting with extreme violence, threatening her very life, knew what was going on. He thought that out, as much thinking as it takes to hit somebody over the head and to forcibly rape them.

Finally, he does what is a very rational, albeit very sad, sad act. He is walking away, he is pulling up his pants. He says, "I am sorry, Diane." Truly a rational act, pathetic in a way and way too late, and she says to him, she says, "I don't care. I won't forgive you. I hope God does or God will," something to that effect. Mr. Lawrence is fully aware of the consequences for his actions, and for a brief moment he feels bad.

Then when he knows he's in big trouble, I suggest to you what this letter shows is when he is about to go to trial on this case, he writes a letter where he purports to know exactly what happened. You will have this letter back in evidence. You don't have to read this, I realize it's probably not blown up big enough, but the letter is into evidence, the parties have agreed that this is Mr. Lawrence's handwriting.

There Mr. Lawrence tries to say, "Hey, we met, we cuddled, you took off your pants and you said, 'Fuck me.'" In other words, Mr. Lawrence says, "Gee, Diane, you agreed to participate in all this. How come we're—what's going on? How come we're going to trial now?" Another rational act of a man who's thinking about the very serious consequences he's facing.

Dr. Petrich says—Dr. Petrich says Mr. Lawrence can't think. He's too severely retarded, he drinks, he's got dementia, in other words, he's got a significant decline in his mental functioning, so he can't think. He's like an unguided missile. Dr. Petrich says he's just out there like a man walking through traffic, no idea what's going to happen to him.

Lawrence claims this statement was flagrant, ill-intentioned, and severely prejudiced his defense of diminished capacity. We disagree. Although the prosecutor referred to facts not in evidence, the prosecutor negligently believed that Diane had made the statement at trial. The statement was contained in the Certification for Determination of Probable Cause, but the prosecutor failed to elicit the testimony from Diane. With proper objection and with curative instructions, the jury would have likely disregarded the remark.

Lawrence also claims the State misrepresented the burden of proof. In closing argument, defense counsel argued that the evidence showed that the sex was consensual between Diane and Lawrence. In rebuttal, the prosecutor argued that the evidence did not support Lawrence's claim that the sex was consensual. The defense objected, claiming the State had shifted the burden of proof to the defense. The court overruled the objection, and later gave the jury an instruction that the State had the burden of proving all the elements beyond a reasonable doubt. This statement by the prosecutor was not improper, and thus we need not determine whether the remark affected the jury's verdict.

## IV. WASHINGTON'S TWO STRIKES LAW

Washington's Persistent Offender Accountability Act (POAA), RCW 9.94A.120(4), also known as the "three

strikes law," has been upheld under both the federal and state constitutions. *State v. Morin*, 100 Wn. App. 25, 28, 995 P.2d 113, *review denied*, 142 Wn.2d 1010 (2000) (citing *State v. Manussier*, 129 Wn.2d 652, 921 P.2d 473 (1996); *State v. Rivers*, 129 Wn.2d 697, 921 P.2d 495 (1996); *State v. Thorne*, 129 Wn.2d 736, 921 P.2d 514 (1996)). In 1996, the Legislature amended the law to classify certain sex offenders as persistent offenders after two convictions. Lawrence was sentenced under this amendment. RCW 9.94A.030(29)(b). The statute provides:

> "Persistent offender" is an offender who:
>
> . . . .
>
> (b)(i) Has been convicted of: (A) Rape in the first degree, rape of a child in the first degree, child molestation in the first degree, rape in the second degree, rape of a child in the second degree, or indecent liberties by forcible compulsion; . . . .
>
> (ii) Has, before the commission of the offense under (b)(i) of this subsection, been convicted as an offender on at least one occasion, whether in this state or elsewhere, of an offense listed in (b)(i) of this subsection.

RCW 9.94A.030(29)(b)(i) and (ii) (1999).

Lawrence claims that the "Two Strikes" statute violates the defendant's right to equal protection, is an ex post facto law, and is bill of attainder.

A. Equal Protection

The trial court imposed a sentence under the "Two Strike" provision partly based on a 1974 attempted rape in the first degree conviction from New York. The court found that it was comparable to attempted rape in the second degree in Washington, a "most serious offense" under RCW 9.94A.030(29)(b)(i) and (ii) (1999). Lawrence claims that application of the "Two Strikes" sentencing provision to out-of-state convictions results in disparate treatment of similarly situated defendants and violates equal protection guarantees. Lawrence claims that unlike the "Three Strikes" law, *see* RCW 9.94A.120.030(25)(u) (1999), the "Two Strikes" law does not require the court to compare an

out-of-state conviction. The "Two Strikes" statute applies only to offenses specifically named in that statute. RCW 9.94A.030(29)(b) (1999). As a result, Lawrence claims that whether an out-of-state conviction constitutes a strike turns, not on the acts committed, but on the name assigned to the offending conduct by the foreign jurisdiction.

The statute does not require such an absurd result. The statute lists certain substantive crimes and counts the convictions for those crimes whether committed in Washington or elsewhere. Whether an out-of-state conviction is equivalent to a crime listed in the statute requires a factual inquiry into the elements. Lawrence's crime involved both threat and use of actual force, and a resulting injury. Thus, Lawrence's prior conviction was for a crime with elements the same as those of a crime named in Washington's statute. It is a strike under Washington law.

### B. The Ex Post Facto Clause

This court in its decision upholding Washington's "Three Strikes" law rejected a challenge similar to Lawrence's ex post facto claim. The argument that the law increases the punishment associated with his prior crime because the crime was used to classify him as a persistent offender was rejected in *State v. Angehrn*, 90 Wn. App. 339, 342-44, 952 P.2d 195, *review denied*, 136 Wn.2d 1017 (1998), *cert. denied*, 528 U.S. 833 (1999). As Lawrence acknowledges, a similar resolution of this issue would apply to the "Two Strikes" law as well. Lawrence has given no reason why this court should reconsider the ruling in *Angehrn*.

### C. The Bill of Attainder

Lawrence argues that the "Two Strikes" provision violates the federal and state constitution prohibiting bills of attainder. The Washington Supreme Court in a challenge to the "Three Strikes" legislation rejected the identical argument. *Manussier*, 129 Wn.2d at 665-67. This court is bound

242

by the decision of the Washington Supreme Court. The "Two Strikes" law is not a bill of attainder.

Affirmed.

COLEMAN and GROSSE, JJ., concur.

Review denied at 145 Wn.2d 1037 (2002).