IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

2014 FEB -3 AM 9:22
COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 69439-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| ERIC UMUSAGA PULEGA, | ) | |
| | ) | |
| Appellant. | ) | FILED: February 3, 2014 |

SCHINDLER, J. — A jury convicted Eric Umusaga Pulega of robbery in the second

degree. Pulega seeks reversal on the grounds that the identification procedure violated

due process. In the alternative, Pulega argues the court abused its discretion in

admitting the 911 call and a patrol car video of his detention, as well as overruling

objections to the testimony of Officer Shawn Hilton. We affirm.

FACTS

At approximately 7:30 a.m. on a sunny Saturday morning on April 21, 2012, Neil

Spencer went to the Chase Bank located at the corner of Fifth Avenue and Union Street

to use the automated teller machine (ATM). There are two ATMs located inside a small

glassed-in vestibule at the Bank. Spencer entered the vestibule at 7:39 a.m. As he

walked up to the ATM nearest to the windows, a man, later identified as Eric Umusaga

Pulega, walked up to the other ATM. Spencer inserted his debit card into the ATM and

entered his pin number to obtain the balance in his account. After looking at the balance, Spencer put the receipt in his pocket. As he was doing so, Spencer looked over and noticed Pulega was having trouble using the ATM with his EBT card.[1] Spencer then reinserted his card in the ATM to obtain $20 from his account. Before Spencer could retrieve the $20, Pulega knocked him to ground, grabbed the $20 bill from the ATM, and ran outside. Spencer got up and chased Pulega around the block and through the lobby of the Red Lion Hotel.

At 7:41 a.m., a woman who saw what happened from across the street called 911 to report the robbery at the Bank. The woman, Helen Johnsen, described Pulega as an African American male, "very . . . slight in stature, probably around 5 foot 6," and "probably in his early twenties with long, black frizzy hair, tied in a ponytail, and a mustache." Johnsen said the man was wearing a black shirt or jacket and "brownish-black sweatpants."

After losing sight of Pulega at the Red Lion Hotel, Spencer ran back to the Bank and used his cell phone to call 911 at approximately 7:42 a.m. Spencer told the 911 operator that he was "just robbed" while withdrawing money from the ATM at the Chase Bank located at Fifth and Union. Spencer said he chased the man into the Red Lion Hotel but lost sight of him. Spencer described the man as either "black or Hispanic," "kind of skinny," in his twenties with "a kinky hairdo," and wearing all black clothing.

Several Seattle Police Department officers responded to the 911 calls. Officer Renee Miller was on First Avenue near Stewart Street when she received information about the robbery and a description of the suspect. Officer Miller decided to drive to

---

[1] An electronic benefits transfer (EBT) card allows ATM cash withdrawals to purchase groceries.

2

Third Avenue "to see if the suspect had gone south" after leaving the Red Lion. Officer Miller saw a male in the middle of the block between Pike Street and Union Street "that matched the description [of the suspect]." The man "appeared to be black or Hispanic, in his 20s, with kinky hair pulled into a 'frizzy' ponytail, and was wearing black clothing." Officer Miller followed the man as he "walked briskly northbound on Third Avenue towards Pike Street, crossed Pike Street to meet with three other males, walked eastbound on Pike Street, and then north on Fourth Avenue."

Meanwhile, Officer Michael McDonald drove to the Chase Bank at Fifth and Union. When he arrived at the Bank, Spencer "flagged" him down. Officer McDonald described Spencer as slight, approximately six feet tall, and wearing eyeglasses. Officer McDonald said that Spencer was somewhat "out of breath, very excited," and his left ear was bleeding. Officer McDonald "asked him real quick what happened." As he was talking to Spencer, Officer McDonald "heard a broadcast over the . . . radio that Officer Miller . . . had spotted a possible suspect in the area." Officer McDonald asked Spencer "if he would be able to identify this guy if we were able to stop and . . . detain anybody who was possibly involved." Spencer told Officer McDonald, "Yeah, I can identify him." Before leaving, Officer McDonald took a photograph of Spencer and retrieved the withdrawal receipt from the ATM.

When Officer McDonald reached Fourth Avenue, he saw Officer Miller's patrol car, and heard Officer Miller identify "a suspect on the west sidewalk." Officer McDonald "thought that [Officer] Miller was referring to a person walking behind Pulega." Spencer was "very adamant, 'No, that's not him.' "

Officer Miller then looked over at Officer McDonald and "raised her arms and shrugged her shoulders, giving [Officer] McDonald a puzzled look." Officer McDonald "interpreted this to mean that [Officer] Miller was confused about the lack of identification of Pulega." Officer McDonald testified,

> Well, you know, we had -- you know, I'd been working with [Officer Miller] a lot -- a lot of years. She just looked at me like -- like -- you know, kind of gave me that puzzled look like -- because she was -- she was -- Officer Miller at that time, the person she was following, she was adamant that she -- pretty sure she had the right suspect.

Officer Miller "then pointed westbound down Pine Street, in the direction of where Pulega was walking." Officer McDonald then drove down the block and asked Spencer, " 'Is that the guy up there?' " Spencer said, " 'No, I -- well, that guy's too far away.' " When Officer McDonald turned the corner to get closer, Spencer "yelled, unprompted, 'That's him,' or 'That's the guy.' "

Pulega made a "quick turn into the Westlake bus tunnel on Pine Street." Officer McDonald parked the patrol car and followed him into the bus tunnel. Officer McDonald detained Pulega in the bus tunnel at 7:50 a.m. Other officers later detained and searched Pulega in front of Officer McDonald's patrol car. "Pulega repeatedly yelled at a woman he called 'Kylie,' saying loudly that the officers were asking about the $20 that she gave him and asking her to collect the $20." The woman told Officer Miller that she did not give Pulega $20. During the search of Pulega, the police found a single $20 bill and an EBT card. Spencer confirmed Pulega was the person who robbed him.

On April 24, the State charged Pulega with robbery in the second degree. The State filed an amended information charging Pulega with robbery in the first degree. Pulega pleaded not guilty and filed a motion to suppress, arguing the police did not

4

have reasonable suspicion to stop or seize him. Pulega also argued the identification procedure was impermissibly suggestive and violated due process.

Officer McDonald and Officer Miller testified at the 3.6 hearing. The court denied the motion to suppress. The court ruled the police had reasonable suspicion to stop and seize Pulega:

> [T]he officers had more than reasonable suspicion to detain Pulega, and in fact, had probable cause to arrest him for the crime of robbery in the first or second degree. . . . The officers had reasonable suspicion and probable cause based on the totality of the circumstances.

The court also ruled there was no "unreasonable or any unlawful taint on the part of law enforcement that created a suggestibility to the eye witness/victim as to his identification of Mr. Pulega." The court entered extensive written findings of fact and conclusions of law.

During the four-day jury trial, the State called a number of witnesses to testify including Spencer, Officer McDonald, Officer Miller, and the other officers involved in the detention and arrest of Pulega. The court admitted into evidence two videotapes from Chase Bank. The videotape recordings are from two different angles. One camera is pointed at the two ATMs and the other camera is from a side angle in the vestibule. The court also admitted the 911 call from Spencer, a videotape from the surveillance camera at the Red Lion Hotel, a patrol car video showing the location of Officer Miller's and Officer McDonald's patrol car on Pine Street, and a patrol car video of the detention and search of Pulega.

The videotapes from the Bank show Pulega enter the vestibule at 7:34 a.m. and then leave approximately 30 seconds later. Pulega's dark frizzy hair is pulled back into a low ponytail and he is wearing dark clothing and a light-colored sparkly belt. Pulega

enters the vestibule again at 7:37 a.m. and stands to the left of the ATM closest to the window, out of view of the camera. Spencer enters the vestibule two minutes later at 7:39 a.m. As Spencer walks up to the ATM near the window, Pulega comes back into view and walks up to the other ATM. One of the videotapes show Spencer looking at Pulega as he walks over to the ATM next to him, and looking over at Pulega again about a minute later when Pulega appears to be having trouble with the ATM. The videotapes also show Pulega glancing over at Spencer several times.

After Spencer withdraws $20 from the ATM, the videotapes show Pulega suddenly rushing at Spencer, knocking him to the ground, grabbing the money from the ATM, and running outside. A few seconds later, Spencer gets up and runs out of the vestibule.

Spencer testified that when he was next to Pulega, he saw Pulega's "face[,] his clothes[,] his hair." Spencer said that Pulega "sucker-punched" him "into [his] left ear," knocked him to the ground, took the $20 bill, and ran out of the vestibule. On cross-examination, Spencer testified that the prosecutor showed him the Chase Bank ATM videotapes "several times [at] different angles."

The defense introduced into evidence a number of still photographs from the Bank videotapes but did not call any witnesses to testify at trial. At the request of the defense, the court instructed the jury on the lesser-included crimes of robbery in the second degree and theft in the third degree.

In closing argument, the defense attorney told the jury Pulega was "guilty of a theft [in the third degree], and he's prepared to accept the consequences for that," but argued Pulega was not guilty of robbery. The defense argued Pulega "simply reach[ed]

6

over to grab the money . . . when Mr. Spencer unexpectedly stumbled" and fell, hitting his head on the edge of the ATM. The defense relied on the still photographs from the Bank videotapes to support the argument that Pulega did not use threats or force to obtain the $20 and did not inflict bodily harm on Spencer:

> I would submit that we should look at these [photographs] for a few different things. One is look where Mr. Spencer's arm is here. It's around the corner on the edge of the casing of the machine, for lack of a better word.
>
> When you look at [Exhibit] No. 46 -- that was 42 -- look where his head is. His head is on the edge of the casing above the ATM.
>
> Exhibit 25, look at the line here of where the injuries are. Ask yourself, "Did Mr. Spencer fall into the edge of the machine casing and hit his head there?" I'd submit that these pictures say that he did.
>
> Again, you can still see my client's hand, his left hand, and I know the prosecutor's trying to say that you can tell with certainty that my client's hand is in contact with Mr. Spencer, but Mr. Spencer told you he was not hit on his right-hand side. He was not pushed or shoved. There was no testimony of that nature.
>
> . . . .
> I mean, certainly Mr. Spencer -- other than the fact that Mr. Spencer says that there was no sort of threats or words or exchanges. There was no, you know, telling him to stay down, anything like that. There was nothing, no words exchanged. Certainly these pictures don't show any contact.
>
> I think the last set is comparisons of that two- to three-second time period. In [Exhibit] 44 you don't see Mr. Spencer. I'd submit that he's down below the level of the -- of the picture at that point, because you do see him over here. You can see again my client's left hand with something white or light-colored in it. He's leaving. My client committed a theft that day, pure and simple.
>
> So when you look at these pictures and when you look at the videos, as you have several times during the course of this trial, and you talk about these things, ask yourself, did you see him step behind Mr. Spencer? Did you see him strike Mr. Spencer? And did you see those things beyond a reasonable doubt? Or did he simply reach over to grab the money and plan to split when Mr. Spencer unexpectedly stumbled, fell, jerked his body, and fell to the left, not the right, even though that's what he testified to, and hitting his head on the left side edge of the case -- the cash machine casing and falling to the left towards the grate and onto his back.

7

The jury found Pulega guilty of the lesser-included offense of robbery in the second degree. The court imposed a standard-range sentence of 13 months.

ANALYSIS

Eyewitness Identification

Pulega asserts the court erred in concluding the identification procedure was not impermissibly suggestive or tainted by police conduct. The court's conclusions of law state, in pertinent part:

> 2. The officers had reasonable suspicion and probable cause based on the totality of the circumstances. First, Pulega generally matched the suspect description on the 911 calls. Second, Pulega was found only a few blocks from the robbery scene only eight minutes after the robbery. Third, the victim Neil Spencer, unprompted, identified Pulega as the robber when Spencer was sitting in the back of McDonald's patrol car and before Pulega was detained by the police.
>
> 3. The court also concludes that there was no impermissibly suggestive identification procedure regarding Spencer's identification of Pulega. Spencer spontaneously said, "That's the guy" or "That's him" when he saw Pulega on the sidewalk after Officer McDonald turned left on Pine Street. Spencer's identification of Pulega was certain and was not even in response to a question. Moreover, the court concludes that Spencer's identification was not tainted by any conduct of Officer Miller or Officer McDonald prior to the identification.

We review the decision to deny a motion to suppress to determine whether the findings are supported by substantial evidence and whether those findings, in turn, support the conclusions of law. State v. Ross, 106 Wn. App. 876, 880, 26 P.3d 298 (2001). Evidence is substantial if it is sufficient to persuade a fair-minded, rational person of the truth of the finding. State v. Levy, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006). Where the findings are not challenged, we treat the findings of fact as verities

on appeal and review the conclusions of law de novo. State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003); State v. Johnson, 128 Wn.2d 431, 443, 909 P.2d 293 (1996).

An out-of-court identification procedure meets the requirements of due process if it is not so impermissibly suggestive as to give rise to the substantial likelihood of irreparable misidentification. State v. Vickers, 148 Wn.2d 91, 118, 59 P.3d 58 (2002). To establish a due process violation, the defendant must first show the identification procedure is impermissibly suggestive. Vickers, 148 Wn.2d at 118. Due process is implicated "only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." Perry v. New Hampshire, 132 S. Ct. 716, 724, 181 L. Ed. 2d 694 (2012).

If the defendant fails to show the identification procedure is suggestive, the inquiry ends. Vickers, 148 Wn.2d at 118; Perry, 132 S. Ct. at 721.

> When no improper law enforcement activity is involved, . . . it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.

Perry, 132 S. Ct. at 721.

If the defendant proves the identification procedure was suggestive, the court must determine whether, considering the totality of the circumstances, the suggestiveness created a substantial likelihood of irreparable misidentification. Vickers, 148 Wn.2d at 118.

> Even when the police use such a procedure, . . . suppression of the resulting identification is not the inevitable consequence. . . . Instead of

9

> mandating a *per se* exclusionary rule, . . . the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a "substantial likelihood of misidentification."

Perry, 132 S. Ct. at 724 (quoting Neil v. Biggers, 409 U.S. 188, 201, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972)). The Supreme Court in Biggers identified the factors the court considers in determining whether there was a substantial likelihood of misidentification. Biggers, 409 U.S. at 199-200. The Biggers factors include (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of his prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, (5) and the time between the crime and the confrontation. Biggers, 409 U.S. at 199-200; see also Manson v. Brathwaite, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

Pulega argues the record establishes the show-up identification procedure was impermissibly suggestive because the police pointed out Pulega to Spencer. The State contends the police did not use a show-up identification procedure and substantial evidence supports the conclusion that the identification procedure was not impermissibly suggestive.

The unchallenged findings of fact support the conclusion that there was no impermissibly suggestive identification procedure and that Spencer "yelled, unprompted, 'That's him.' " Further, the case Pulega cites, State v. McDonald, 40 Wn. App. 743, 700 P.2d 327 (1985), is distinguishable. In McDonald, police officers told a victim during a lineup which person had been arrested for the crime. McDonald, 40 Wn. App. at 744.

The unchallenged written findings of fact state, in pertinent part:

> (6) Communicating with Officer Miller, [Officer] McDonald was advised that Pulega was walking northbound on Fourth Avenue, just a block and [a] half away from the crime scene. [Officer] McDonald followed [Officer] Miller's patrol car while traveling in the lane of traffic three lanes away from the west sidewalk (Fourth Avenue is a one-way northbound four-lane road). Hearing [Officer] Miller refer to a suspect on the west sidewalk, [Officer] McDonald thought that [Officer] Miller was referring to a person walking behind Pulega. Spencer said that this person (who was not Pulega) was not the person who robbed him.
>
> . . . .
>
> (7) After Spencer did not make a positive identification of the person walking behind Pulega, [Officer] McDonald pulled alongside [Officer] Miller's car and looked at her. [Officer] Miller raised her arms and shrugged her shoulders, giving [Officer] McDonald a puzzled look. [Officer] McDonald interpreted this to mean that [Officer] Miller was confused about the lack of identification of Pulega. [Officer] Miller then pointed westbound down Pine Street, in the direction of where Pulega was walking. [Officer] McDonald turned the corner westbound on Pine Street, and saw Pulega walking briskly towards the bus tunnel. As they pulled closer to Pulega, Spencer looked at Pulega and yelled, unprompted, "That's him," or "That's the guy."
>
> (8) Pulega made a quick turn into the Westlake bus tunnel on Pine Street as [Officer] McDonald drove past him. [Officer] McDonald contacted Pulega in the bus tunnel, seizing Pulega and detaining him at the front of his patrol car. At this time, Spencer affirmed that Pulega was the robber.

Officer McDonald testified that when he asked Spencer whether the person walking behind Pulega robbed him, Spencer told him unequivocally that "this person . . . was not the person who robbed him." Officer McDonald testified that after he pulled up alongside Officer Miller's patrol car, Officer Miller looked over at Officer McDonald with a puzzled expression, shrugged her shoulders, and "pointed westbound down Pine Street, in the direction of where Pulega was walking."

Because the unchallenged findings of fact and record support the court's conclusion that the police identification procedure was not impermissibly suggestive, we do not consider the Biggers factors.[2]

Evidentiary Rulings

In the alternative, Pulega contends he is entitled to a new trial because the court erred in (1) admitting the 911 call from Spencer, (2) admitting the patrol car video that shows the detention and search of Pulega, and (3) overruling his objections to the prejudicial testimony of Officer Shawn Hilton.

We review decisions on the admissibility of evidence under an abuse of discretion standard. State v. Stenson, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997). An abuse of discretion exists "[w]hen a trial court's exercise of its discretion is manifestly unreasonable or based upon untenable grounds or reasons." Stenson, 132 Wn.2d at 701. A discretionary decision "is based 'on untenable grounds' or made 'for untenable reasons' if it rests on facts unsupported in the record or was reached by applying the wrong legal standard." State v. Rohrich, 149 Wn.2d 647, 654, 71 P.3d 638 (2003).

1. 911 Call

Pulega contends the court erred in admitting the 911 call as an excited utterance under ER 803(a)(2). Pulega asserts Spencer was not under the influence of a startling event at the time of the call. The State contends Spencer was still " 'under the stress or excitement' " when he made the 911 call to report the assault and robbery.

Under ER 803(a)(2), a statement is not excluded as hearsay if it is an excited utterance "relating to a startling event or condition made while the declarant was under

---

[2] Accordingly, we also do not consider cross-racial identification.

12

the stress of excitement caused by the event or condition." The proponent of the admission of an excited utterance must satisfy three " 'closely connected requirements' ": (1) that a startling event or condition occurred, (2) the declarant made the statement while under the stress of excitement of the startling event or condition, and (3) the statement related to the startling event or condition. State v. Young, 160 Wn.2d 799, 806, 161 P.3d 967 (2007) (quoting State v. Woods, 143 Wn.2d 561, 597, 23 P.3d 1046 (2001)). The critical determination "is 'whether the statement was made while the declarant was still under the influence of the event to the extent that [the] statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment.' " State v. Brown, 127 Wn.2d 749, 758, 903 P.2d 459 (1995)[3] (quoting State v. Strauss, 119 Wn.2d 401, 416, 832 P.2d 78 (1992)).

The court found that when Spencer called 911 a "very few minutes" after the robbery, he was "under the stress of excitement caused by the event."[4] ER 803(a)(2). The court ruled, in pertinent part:

> In this instance the Court finds that it was more likely than not a matter of very few minutes after the alleged incident occurred that Mr. Spencer . . . made the 911 call, that the alleged assault and taking of Mr. Spencer's money qualifies as a startling event, and that Mr. Spencer's calling 911 was a cry for help and statements made were subject to his reacting to the startling event to qualify for the excited utterance exception to the hearsay rule, and therefore, the 911 call is admissible.

The record supports the court's findings. The robbery occurred at 7:40 a.m. Spencer chased Pulega around the block and through the Red Lion Hotel lobby for approximately two minutes before losing sight of him. Spencer called 911 at 7:42 or

---

[3] (Alteration in original.)

[4] The robbery occurred at 7:40 a.m. and Spencer called 911 at approximately 7:42 a.m.

7:43 a.m. to report the robbery and get help. The court did not abuse its discretion in concluding Spencer was still under the stress of the robbery when he called 911.

Even if error, the decision to admit the 911 call as an excited utterance constitutes harmless error. An error is " 'not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred.' " State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997) (quoting State v. Tharp, 96 Wn.2d 591, 599, 637 P.2d 961 (1981)). "The improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole." Bourgeois, 133 Wn.2d at 403.

Here, the admission of the 911 call was of minor significance. During closing argument, Pulega did not contest that he took the $20 from Spencer at the ATM. Instead, Pulega argued that he did not take the money by force and the injuries Spencer suffered were the result of Spencer hitting his head on the side of the ATM.

2. Patrol Car Video

Pulega argues the court abused its discretion by admitting the patrol car video of the police detention and search of Pulega. Pulega asserts the prejudice outweighed the minimal relevance of showing Pulega being restrained and searched by police. Below, the defense argued the video was improper character evidence and prejudicial because it showed Pulega gesturing and yelling. The State argued the video was relevant to establish identity and the seizure of the EBT card and the $20 bill from Pulega. The State also argued the video allowed the jury to compare the person in the ATM Bank videos with the person arrested.

14

After watching the patrol car video, the trial court rejected the defense argument and allowed the State to introduce the patrol car video into evidence. The court ruled the evidence was "highly probative" of identification and "what . . . Mr. Pulega look[ed] like on the date of the incident compared with the videos at the Chase Bank." The court ruled, in pertinent part:

> I'm not clear how this would be character evidence. I don't see any conduct that would show admissibility of guilt or how any of Mr. Pulega's actions while in detention is in conformity with the charged offense of robbery, so it's just -- it -- I don't see that it even qualifies as any type of improper character evidence.
>
> . . . .
>
> From my perspective, it's actually the best evidence. Yes, officers did testify that these are the items retrieved, but there was always the suggestion that was it -- were these items planted? And it's not as though items have never been planted by law enforcement. They have. We know that. And so, from my perspective, this removes that question in the jurors' minds of the credibility of the officers' testimony and corroborates it to a certain degree.
>
> I don't really have concerns about Mr. Pulega appearing in a fashion that is highly prejudicial to him. Yes, at one point he raises his hands and the police put them down, but -- I mean, I think everyone can understand that that's for officer safety and that's a routine matter.
>
> As far as his yelling, I think the officers can testify and it's consistent with the State's theory of the case that Mr. Pulega yelled at -- towards Kiley with respect to the issue of, "Take your $20 back."
>
> It is highly probative of the issue of identification what did Mr. Pulega look like on the date of the incident compared with the videos at the Chase Bank. And we must remember that regardless of what evidence the defense chooses to put on or not put on, the State always has its high burden of proof, and inasmuch, I would find that the video offered by the State is highly probative and not prejudicial to the degree that it substantially outweighs that probativity. I'll allow the State to show the video. Motion to exclude is denied.

At the request of the defense, before the jury saw the video, the court gave the jury the following limiting instruction:

> Members of the jury, the evidence which you are about to see, which is a video from Officer McDonald's car, patrol car, is being shown for the limited purpose of the State's offer of identification of the defendant,

the location of the defendant, and identification of items in his possession, and for no other purpose. You must not consider the evidence for any other purpose.[5]

Under ER 403, even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. State v. Coe, 101 Wn.2d 772, 782, 684 P.2d 668 (1984). The trial court is vested with broad discretion in deciding to balance relevance against prejudice. State v. Baldwin, 109 Wn. App. 516, 528, 37 P.3d 1220 (2001), review denied, 147 Wn.2d 1020, 60 P.3d 92 (2002).

The trial court did not abuse its discretion in ruling admission of the probative patrol car video outweighed any prejudice. The patrol car video was relevant to prove identity by comparing the appearance of the person in the somewhat blurry ATM Bank videotape with the patrol car video of Pulega and his clothing and, in particular, the distinctive belt he was wearing. We also presume the jury followed the instruction of the court to consider the evidence only for the limited purpose of identification and the identification of the items in Pulega's possession. Carnation Co. v. Hill, 115 Wn.2d 184, 187, 796 P.2d 416 (1990).

### 3. Objection to Testimony of Officer Hilton

Pulega contends the court abused its discretion by overruling the defense objections to Officer Hilton's testimony. In response to general questions during direct examination, Officer Hilton testified that part of his job is "apprehending bad guys" and robberies are "inherently violent." Officer Hilton's testimony that his job was "apprehending bad guys" was in response to a question about his duties as a police officer. Officer Hilton's statement that robberies were "inherently violent" was in

---

[5] At the conclusion of the instruction, a juror asked the trial judge to repeat the three purposes for showing the video, and the judge did so.

response to a question about why he responded to the robbery, and was consistent with the jury instructions defining the crime of "robbery." See State v. Lillard, 122 Wn. App. 422, 437, 93 P.3d 969 (2004) (holding that a police officer's testimony describing how he conducted his investigation was admissible), review denied, 154 Wn. 2d 1002, 113 P.3d 482 (2005). The court did not abuse its discretion in overruling the objections to Officer Hilton's testimony.

Cumulative Error

Pulega claims he is entitled to a new trial under the cumulative error doctrine. The cumulative error doctrine applies where several trial errors standing alone do not warrant a new trial, but when combined, may require a new trial. State v. Grieff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). Because we conclude the court did not err in admitting the 911 call, the patrol car video, or overruling objections to the testimony of Officer Hilton, the cumulative error doctrine does not apply. Grieff, 141 Wn.2d at 929.

We affirm the jury conviction of robbery in the second degree.

WE CONCUR:

17