FILED
COURT OF APPEALS
DIVISION II

2015 MAY 12 AM 8:41

STATE OF WASHINGTON
BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 44998-6-II |
| Respondent, | |
| v. | |
| TYRONE EAGLESPEAKER, | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — A jury found Tyrone Eaglespeaker not guilty of burglary in the first degree and rape in the first degree but guilty of rape in the second degree and two drug offenses. Eaglespeaker appeals his rape conviction, arguing that the trial court erred by instructing the jury on the inferior-degree offense of rape in the second degree, by admitting the victim's 911 call and statements to a police officer as excited utterances, by admitting statements Eaglespeaker made to law enforcement officers after invoking his right to an attorney, by imposing discretionary legal financial obligations (LFOs). Eaglespeaker also argues that cumulative error entitles him to relief. In a statement of additional grounds (SAG), Eaglespeaker argues that the trial court erred by admitting photographs of text messages that the victim received on her cell phone.

We hold that the evidence supported the instruction on rape in the second degree, that the error in admitting the victim's statements was harmless, that the admission of Eaglespeaker's statements did not violate his Fifth Amendment rights, and that Eaglespeaker's failure to challenge

his LFOs at sentencing waived his right to challenge them on appeal. We also find that the trial court did not abuse its discretion by admitting the text message evidence and that cumulative error does not entitle Eaglespeaker to relief from his convictions. We affirm the judgment and sentence.[1]

FACTS

On December 21, 2012, at approximately 11:30 A.M., J.R.[2] called 911 and stated that a few days previously, Eaglespeaker, her friend's boyfriend, had sexually assaulted her. Deputy Christian Lyle responded, and J.R. told him that Eaglespeaker entered her house without permission and attempted to have sex with her. J.R. knew Eaglespeaker because he was dating her friend Nicole Nash. J.R. showed Lyle some clothing that she said belonged to Eaglespeaker as well as a credit card in his name. Lyle photographed a series of text messages sent to J.R.'s phone over the past two days that she attributed to Eaglespeaker.

Detective Tim Garrity arrived a short time later and took a recorded statement from J.R. Ruanna Johnson then arrived to help J.R. with her children. Johnson told Garrity that she was the caretaker for Nash's residence and that Eaglespeaker was staying there while Nash was out of town. While the officers were investigating J.R.'s 911 call, dispatch received a hang-up 911 call from Nash's home.

Johnson eventually let Deputy Gary Manning and Sergeant Jay Johnston into Nash's home after they knocked and nobody responded. Dispatch had already advised Manning that the 911 call he was investigating could be related to the call that Lyle was handling. Manning and Johnston

---

[1] Appellant's counsel refers to matters outside the record in the opening brief. The references are inappropriate. *See State v. Crane*, 116 Wn.2d 315, 335, 804 P.2d 10 (1991) (matters outside the record cannot be considered on appeal).

[2] As a survivor of a sexual assault, and to protect her identity, we use J.R.'s initials.

began doing a protective sweep for anyone present. When Eaglespeaker emerged from a bedroom, Manning handcuffed him for officer safety and asked if he had tried to call 911. Eaglespeaker admitted that he had after hearing someone say "he had done something to someone." Clerk's Papers (CP) at 111.

Garrity and Lyle arrived, and Manning told Eaglespeaker that Garrity would want to talk to him about another incident. After telling Garrity that he had heard J.R. made up a story about him, Eaglespeaker said, "[M]y father has an attorney," and "maybe I should call my dad." CP at 111. Manning read Eaglespeaker his *Miranda* rights,[3] and Eaglespeaker said he wanted to speak to the officers.

Eaglespeaker admitted that he frequently went over to J.R.'s home but added that he always knocked before entering. He said that she had asked him to shower with her a few days ago but that he had declined. He denied having sexual relations with her. Garrity asked Eaglespeaker for his phone knowing that a cell phone and text messages were involved. Eaglespeaker directed him to the bedroom, where Garrity found drugs and drug paraphernalia. Garrity arrested Eaglespeaker and Lyle took him to jail.

On the evening of December 23, Eaglespeaker asked to speak to a deputy. Eaglespeaker told the responding deputy, Mike Hepner, that he wanted to work off his charges. When Hepner replied that he did not know why Eaglespeaker was in jail, Eaglespeaker responded "rape," and Hepner said he would pass it on to a detective. CP at 114. Eaglespeaker then added, without prompting from Hepner,

> I did not rape her, she answered the door naked and wanted to have sex. I told her no because I have a girlfriend but agreed to finger bang her. I finger banged her for

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

quite a while and then I went home and decided I wanted to have sex because she is so hot. I went back the next day and she again answered the door naked. I asked for sex and she said no but we can take a shower together. I did not want to take a shower I wanted to have sex so I said no and left.

CP at 114.

The State charged Eaglespeaker by amended information with rape in the first degree, burglary in the first degree, unlawful possession of a controlled substance, and use of drug paraphernalia. The trial court held a CrR 3.5 hearing to determine the admissibility of Eaglespeaker's pretrial statements. At its close, the defense did not object to the admission of the statements that Eaglespeaker made at the time of his arrest, but the defense did seek suppression of his jail statements because law enforcement did not readvise Eaglespeaker of his *Miranda* rights before he made them. The trial court entered written findings of fact and conclusions of law to support its ruling that with one exception, Eaglespeaker's statements were admissible.[4]

The State then moved to admit J.R.'s two-minute 911 call into evidence under ER 803(a)(2), the excited utterance exception to the hearsay rule. After listening to part of the call, the trial court granted the State's motion, ruling that the passage of "a couple of days" did not affect the call's admissibility. Report of Proceedings (RP) (Apr. 5, 2013) at 6.

During trial, the law enforcement officers testified to the facts described above. Over Eaglespeaker's objection, the trial court allowed Lyle to testify about J.R.'s initial statements to him under the excited utterance rule. Lyle added that J.R. said she had left a window open on the night of the rape. Lyle testified that her front door showed no signs of forced entry.

---

[4] The court excluded Eaglespeaker's statement that he hung up before anyone answered his 911 call because he did not want to talk to anyone. The court concluded that this statement implicated Eaglespeaker's right to remain silent.

Johnson testified that after J.R. told her about the rape, she persuaded J.R. to call the police because of J.R.'s concern that Eaglespeaker would return. Johnson added that while she was with J.R., Eaglespeaker called. Johnson described the conversation:

> She put her phone speaker phone and she said, "What do you want Tyrone?" and then he's all, "Why you talkin' to me like that?" and then she said, "Why, you know why," and then he's all, "I didn't do nothin' that bad," and then she said, "You call ripping my pants off while I'm screaming no, not that bad?" and he's all, "No, that wasn't that bad."

RP (May 13, 2013) at 143.

Before J.R. testified, Eaglespeaker objected to the admission of the text messages J.R. had received. The defense argued that these messages were irrelevant because there was nothing to show that Eaglespeaker had sent them. J.R. had told officers that when she recovered the phone from Eaglespeaker, the text messages were erased. The trial court responded that J.R. would need to authenticate the texts.

The State then showed J.R. photographs of text messages from her cell phone that Lyle took on December 21, 2012. J.R. explained that Eaglespeaker had been using her boyfriend Scott's cell phone while Scott was incarcerated and while she was exchanging texts with that phone. J.R. added that the texts she received addressed events that were happening while Eaglespeaker had the phone and were "things that only he would know." RP (May 14, 2013) at 32. The court admitted photographs of the texts from December 19 and 20.

The texts started with an exchange about Eaglespeaker helping J.R. sell her boyfriend's truck canopy. J.R. testified that her boyfriend then called from prison and that the two of them had a long argument, during which Eaglespeaker came to her house "a couple times" and left because of the ongoing argument. RP (May 14, 2013) at 36. J.R. later texted Eaglespeaker that she felt "like throwing up" because she was so upset with her boyfriend. RP (May 14, 2013) at

36-37. When Eaglespeaker did not respond, she sent another text asking why he was ignoring her. Eaglespeaker responded that he had just woken up and would "be over in a few." RP (May 14, 2013) at 38. After some additional messages, J.R. texted Eaglespeaker that he could go back to sleep if he wanted. He responded, "I need to shower, [what about you]?" RP (May 14, 2013) at 40. J.R. answered that she always waited until her children were asleep, to which Eaglespeaker replied, "Okay, well if you want me to come over then let me know." RP (May 14, 2013) at 41. J.R. replied, "Sweet dreams." RP (May 14, 2013) at 41. The messages continued:

> [Eaglespeaker]: Yeah, don't let the meth bugs bite.
>
> . . . .
>
> [J.R.]: What's up with you. You're either really nice or really mean, confusing.
>
> . . . .
>
> [Eaglespeaker]: Really mean, but my album's incredible. . . . Are you ready to hump?
>
> . . . .
>
> [J.R.]: No, but at least now I know that's the only reason that you wanted to hang out, not surprising, happens a lot.
>
> . . . .
>
> [Eaglespeaker]: Okay, you're such an ass. You make me feel like an animal or is it cuz I'm an Indian. Well call it what you want, that's what normal people do. To me it seems there's no mutual attraction. You brush me and push me away, tease me. I'm man plus an addict, so you don't have to treat me like I'm being put through a test a time. . . . Wish you felt like I did and not want me for the wrong reasons. . . . I'm leaving your phone on your doorstep, I'm frustrated.
>
> . . . .
>
> [J.R.]: Why does it have to revolve around sex? You're being stupid right now. You're totally tripping. Who cares if you're an addict, who isn't? . . . I didn't do anything to deserve this. . . . Real mature, I didn't think you were that shallow. . . .
>
> [Eaglespeaker]: I'm not shallow. I'm a man who has hung out with you for days and get no affection or attention hardly so naturally I feel like I'm just a reject. . . . If I can't have it my way, I don't want it at all. . . .
>
> . . . .
>
> [J.R.]: I'm speechless basically. . . . . You are being pretty shallow, shallow, shallow. . . . Waste your time elsewhere if [you] want. I[t] won't be my loss, that's for damn sure.

RP (May 14, 2013) at 41-44.

Eaglespeaker then texted, "You up still?" RP (May 14, 2013) at 44. J.R. replied, "Yep, kids just fell asleep." 5-14 RP 45. J.R. testified that she fell asleep at around 3:30 A.M. on December 20. RP (May 14, 2013) at 46. The next thing she knew, Eaglespeaker was standing in her bedroom. J.R. denied giving him permission to enter her home but said that she might have left the back window or door unlocked. She testified that Eaglespeaker forced himself on top of her and penetrated her vagina with his fingers. He left at about 6:15 A.M.

J.R. explained that she felt frightened but did not immediately call the police because she had used drugs recently and feared that Child Protective Services (CPS) might take her children. J.R. had testified earlier that she had been granted a stay of prosecution stemming from recent drug and theft convictions.

J.R. then testified that when Eaglespeaker came to her home four or five hours later to borrow her car, she let him in and let him use the car. J.R. went over to a friend's house to tell her about the rape, but decided not to because Eaglespeaker's friend was there. J.R. did tell Johnson by phone and in person about the rape, and she showed Johnson the texts from Eaglespeaker as well. J.R. also told Nash. Nash and Johnson promised that they would make Eaglespeaker leave the area.

On December 20, J.R. received another text from Eaglespeaker while he was using her car. The message said, "Okay, I just feel like I violated you, sorry, no drama. It's not easy to be on this elevator up and down, down, down." RP (May 14, 2013) at 67. J.R. and Eaglespeaker exchanged several more texts that evening. After Eaglespeaker realized that Johnson was trying to make him leave Nash's residence, he called J.R. and told her that if she didn't tell Johnson she was lying, he would call CPS and Clark County Diversion. Johnson testified that she overheard that call.

That same evening, J.R. had a friend spend the night with her in case Eaglespeaker returned. She testified that she called the police on December 21 after Johnson told her that Eaglespeaker had not left Nash's home. After the State played her 911 call, J.R. explained that she initially reported that Eaglespeaker tried to rape her because she did not realize that digital penetration constituted rape. On cross-examination, she reiterated that she did not immediately call the police because she feared losing her children.

At the State's request, and over defense counsel's objection, the trial court instructed the jury on the uncharged inferior-degree offense of rape in the second degree. The jury acquitted Eaglespeaker of rape in the first degree and burglary in the first degree but found him guilty of rape in the second degree as well as the drug charges. The trial court sentenced Eaglespeaker to 119 months in prison and imposed $6,150 in LFOs. Eaglespeaker appeals his rape conviction as well as the discretionary LFOs imposed.

## ANALYSIS

I.   INFERIOR-DEGREE INSTRUCTION: RAPE IN THE SECOND DEGREE

Eaglespeaker argues that the trial court erred by instructing the jury on the inferior-degree offense of rape in the second degree because no affirmative evidence existed that he committed only that offense.[5] We disagree.

---

[5] Although Eaglespeaker did not object to the inferior-degree instruction on this basis at trial, we choose to address it on the merits. *State v Kindall*, 181 Wn. App. 844, 849, 326 P.3d 879 (2014) (We retain discretion under RAP 2.5(a) to consider an issue raised for the first time on appeal.).

A criminal defendant generally may be convicted only of crimes charged in the State's information. *State v. Corey*, 181 Wn. App. 272, 275, 325 P.3d 250, *review denied*, 181 Wn.2d 1008 (2014). However, a defendant also may be convicted of an inferior-degree offense to a charged crime. *State v. Fernandez-Medina*, 141 Wn.2d 448, 453, 6 P.3d 1150 (2000). RCW 10.61.003 provides:

> Upon an indictment or information for an offense consisting of different degrees, the jury may find the defendant not guilty of the degree charged in the indictment or information, and guilty of any degree inferior thereto, or of an attempt to commit the offense.

A trial court may instruct the jury on an uncharged inferior-degree offense when these factors are met:

> "(1) the statutes for both the charged offense and the proposed inferior degree offense 'proscribe but one offense'; (2) the information charges an offense that is divided into degrees, and the proposed offense is an inferior degree of the charged offense; and (3) there is evidence that the defendant committed only the inferior offense."

*Fernandez-Medina*, 141 Wn.2d at 454 (quoting *State v. Peterson*, 133 Wn.2d 885, 891, 948 P.2d 381 (1997)). Eaglespeaker challenges the third factor, arguing that the evidence was insufficient to establish that he committed rape in the second degree.

In determining whether the evidence is sufficient to support an inferior-degree instruction, we view the supporting evidence in the light most favorable to the instruction's proponent, here the State. *Fernandez-Medina*, 141 Wn.2d at 455-56. Evidence in support of an uncharged inferior-degree offense instruction must consist of more than the jury's disbelief that the defendant committed the superior charged offense and instead must affirmatively establish that the defendant committed the inferior-degree offense. *Fernandez-Medina*, 141 Wn.2d at 456. We review de novo a trial court's decision whether to instruct the jury on an uncharged inferior-degree offense. *Corey*, 181 Wn. App. at 276.

9

To support his claim of error, Eaglespeaker cites *State v. Brown*, 127 Wn.2d 749, 903 P.2d 459 (1995). Brown was charged with rape in the first degree committed by engaging in sexual intercourse with forcible compulsion and by using or threatening to use a deadly weapon. *Brown*, 127 Wn.2d at 754; RCW 9A.44.040(1). The inferior-degree instruction on rape in the second degree required sexual intercourse by forcible compulsion but did not require the use or threatened use of a firearm. RCW 9A.44.050(1)(a). The victim testified that Brown and his accomplices forced her to have sexual intercourse and that he held a gun to her head at one point during the attack. *Brown*, 127 Wn.2d at 754. Brown testified that he and the victim engaged in consensual sex for money. *Brown*, 127 Wn.2d at 754.

On appeal, Brown argued that neither party offered evidence showing that he raped the victim but did not threaten to use a deadly weapon, and the Supreme Court agreed. *Brown*, 127 Wn.2d at 754-55. The court reasoned that evidence tending to impeach the victim's claim that a gun was used did not justify the inferior-degree instruction. *Brown*, 127 Wn.2d at 755. Impeachment evidence that serves only to discredit the State's witness does not establish that only the inferior-degree crime was committed. *Brown*, 127 Wn.2d at 755.

The charge of rape in the first degree in this case required the State to prove that Eaglespeaker engaged in sexual intercourse by forcible compulsion after a felonious entry into J.R.'s home. The inferior-degree instruction on rape in the second degree required proof of sexual intercourse by forcible compulsion but did not require proof of felonious entry. J.R. testified that she did not consent to Eaglespeaker's entry before he raped her, but she added that she might have left her door unlocked, and her text messages suggested that Eaglespeaker had permission to come to her house. Eaglespeaker told officers that he often went over to J.R.'s house, that the doors were always locked, and that he always knocked first. While in jail, he told the deputy that J.R.

10

met him at the door on December 20 and asked him to have sex. A text message to J.R. and a phone call contradicted his statement that this encounter was consensual, as he apologized for having violated her and conceded her lack of consent. When viewed in the light most favorable to the State, the evidence supporting the inferior-degree instruction was more than impeachment evidence and supported the theory that Eaglespeaker engaged in sexual intercourse by forcible compulsion but without a felonious entry. The trial court did not err by instructing the jury on rape in the second degree.

II.     EXCITED UTTERANCE EVIDENCE

Eaglespeaker argues next that the trial court erred by admitting J.R.'s 911 call and initial statements to the police under the excited utterance exception to the hearsay rule. An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." ER 803(a)(2). The trial court's determination that a statement falls within the excited utterance exception is reviewed for an abuse of discretion. *State v. Strauss*, 119 Wn.2d 401, 417, 832 P.2d 78 (1992). An abuse of discretion occurs where a trial court's decision is manifestly unreasonable or based on untenable grounds or reasons. *State v. Magers*, 164 Wn.2d 174, 181, 189 P.3d 126 (2008).

The excited utterance exception is based on the idea that

> "under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control." The utterance of a person in such a state is believed to be "a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock," rather than an expression based on reflection or self-interest.

*State v. Chapin*, 118 Wn.2d 681, 686, 826 P.2d 194 (1992) (quoting 6 J. Wigmore, *Evidence* § 1747, at 195 (1976)) (citations omitted). Consequently, the critical question in admitting excited utterance evidence is "'whether the statement was made while the declarant was still under the

11

influence of the event to the extent that [the] statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment.'" *Brown*, 127 Wn.2d at 758 (quoting *Strauss*, 119 Wn.2d at 416).

The longer the time interval between the event and statement, the greater the need for proof that the declarant did not engage in reflective thought. *State v. Ramires*, 109 Wn. App. 749, 758, 37 P.3d 343 (2002). The fact that the declarant is upset while making the statement is not enough to make it an excited utterance, as the court explained in *State v. Dixon*, 37 Wn. App. 867, 873-74, 684 P.2d 725 (1984):

> If Ms. M's statement to the police were to be admissible as an excited utterance simply because she was "upset," virtually any statement given by a crime victim within a few hours of the crime would be admissible because many crime victims remain upset or frightened for many hours, and even days and months, following the experience.

Similarly, statements made to police after the declarant slept, bathed, and talked to a friend were not spontaneous and were impossible to distinguish from statements routinely given to police by crime victims. *State v. Bargas*, 52 Wn. App. 700, 704, 763 P.2d 470 (1988).

There is no dispute that J.R. was upset when she called 911 and when she first spoke to Deputy Lyle. Nor is there any dispute that she made both communications approximately 30 hours after the attack that she described. J.R. called 911 and spoke to Lyle after initially deciding not to call the police because she was afraid she would lose her children. Before calling 911, J.R. tried to tell a neighbor about the attack, succeeded in describing it to two friends, slept overnight, and engaged in further interaction with Eaglespeaker. She ultimately decided that reporting the attack

12

was the only way to protect herself from Eaglespeaker. The record shows that J.R. had ample opportunity for reflective thought before she made the statements at issue. Consequently, the trial court abused its discretion by admitting J.R.'s 911 call and initial statements to Deputy Lyle as excited utterances.

We will not reverse a conviction, however, if the evidentiary error did not prejudice the defendant. *State v. Thomas*, 150 Wn.2d 821, 871, 83 P.3d 970 (2004). An evidentiary error is not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred. *Thomas*, 150 Wn.2d at 871. The improper admission of evidence is harmless if the evidence is of minor significance in reference to the overall evidence. *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997).

Here, J.R. testified about the details of the attack. Additionally, Eaglespeaker's statements and text messages confirmed much of what she described. The evidence of guilt was overwhelming, and the admission of the excited utterance evidence was harmless error.

III.  DEFENDANT'S STATEMENTS TO LAW ENFORCEMENT

Eaglespeaker argues here that the trial court erred by admitting statements he made to law enforcement officers after he requested an attorney.[6] Eaglespeaker does not assign error to the trial court's findings of fact supporting its suppression ruling, so those findings are verities on appeal. *State v. Acrey*, 148 Wn.2d 738, 745, 64 P.3d 594 (2003). We review a trial court's

---

[6] Eaglespeaker argues that he was in custody before this request but does not challenge the admissibility of any prior statement. We assume that he was in custody when he made the request at issue. *See Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995) (interrogation is custodial when reasonable person would not feel at liberty to terminate questioning and leave).

conclusions of law pertaining to the suppression of evidence de novo. *State v. Arreola*, 176 Wn.2d 284, 291, 290 P.3d 983 (2012).

The Fifth Amendment provides that "[n]o person shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V; *Miranda v. Arizona*, 384 U.S. 436, 439, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).[7] In *Miranda*, the United States Supreme Court adopted a set of measures designed to protect a suspect's Fifth Amendment right from the "inherently compelling pressures" of custodial interrogation. 384 U.S. at 467. These safeguards include a warning that the suspect has the right to remain silent and the right to the presence of an attorney. *Maryland v. Shatzer*, 559 U.S. 98, 103-04, 130 S. Ct. 1213, 175 L. Ed. 2d 1045 (2010).

Under *Miranda*, if an accused indicates that he wishes to consult with an attorney before speaking, there can be no questioning. 384 U.S. at 444-45. An exception to this rule provides that if the accused makes an equivocal request for an attorney, questioning need not cease. *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994). A request for an attorney is equivocal if a reasonable officer would understand only that the suspect might be invoking the right to counsel. *Davis*, 512 U.S. at 459.

After telling Deputy Manning that he had heard J.R. was making up a story about him, Eaglespeaker stated, "[M]y father has an attorney" and "maybe I should call my dad." CP at 111. Manning then read Eaglespeaker his *Miranda* rights. Eaglespeaker said that he understood his rights and wanted to speak to the officers.

---

[7] The Washington Supreme Court has held that article I, section 9 is equivalent to the Fifth Amendment and should receive the same interpretation. *State v. Templeton*, 148 Wn.2d 193, 207-08, 59 P.3d 632 (2002). Consequently, we decline Eaglespeaker's invitation to apply a *Gunwall* analysis to determine whether the state constitution offers greater protection in this regard. *See State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986) (setting forth factors to determine whether state constitution provides broader protection than federal constitution).

The trial court concluded that Eaglespeaker's statements about calling his father were equivocal invocations of his *Miranda* rights. Eaglespeaker disagrees and argues that his statements were comparable to others found to be unequivocal requests for counsel. *See, e.g., State v. Bell,* 2007-1124, P. 1-2 (La. 2007), 958 So. 2d 1173, 1174-75 ("I'd rather wait until my mom get [sic] me a lawyer."); *McDaniel v. Commonwealth,* 28 Va. App. 432, 433, 437, 506 S.E.2d 21, 22, 24 (Va. Ct. App. 1998) ("I think I would rather have an attorney here to speak for me."). We disagree that Eaglespeaker's statements were equivalent to these requests for counsel. Rather, we find Eaglespeaker's statements even more ambiguous than the statement that did not require the cessation of questioning in *Davis*: "Maybe I should talk to a lawyer." 512 U.S. at 462. We agree with the trial court that Eaglespeaker's Fifth Amendment rights were fully protected when the deputy advised him of his *Miranda* rights after he made the equivocal statements at issue.

We make an additional observation about Eaglespeaker's statements to Deputy Hepner while in jail. The term "interrogation" under *Miranda* refers not only to express questioning by police but also to words or actions that are reasonably likely to elicit an incriminating response. *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S. Ct. 321, 64 L. Ed. 2d 297 (1980). We agree with the trial court that Eaglespeaker's statements to Hepner were volunteered and were not made in response to any words or actions likely to elicit an incriminating response. We further agree that all of the statements that Eaglespeaker made after being advised of his *Miranda* rights were admissible in the State's case-in-chief.

III.    CUMULATIVE ERROR

Eaglespeaker argues that he is entitled to relief due to cumulative error. The cumulative error doctrine mandates reversal where the combined effect of several nonreversible errors denied the defendant a fair trial. *State v. Davis,* 175 Wn.2d 287, 345, 290 P.3d 43 (2012), *cert. denied,*

134 S. Ct. 62 (2013). Having identified only a single harmless error that occurred during Eaglespeaker's trial, we decline to grant relief under the cumulative error doctrine.

## IV. LFOs

Eaglespeaker argues that the trial court erred by imposing discretionary costs without determining his ability to pay those costs.

The record shows that the trial court checked the box in the judgment and sentence showing that it had found that Eaglespeaker has the ability to pay the LFOs imposed. Eaglespeaker did not challenge this finding during sentencing so he may not do so on appeal. *State v. Blazina*, 174 Wn. App. 906, 911, 301 P.3d 492, *remanded by* 344 P.3d 680 (2015). Our decision in *Blazina*, issued before Eaglespeaker's sentencing, provided notice that the failure to object to LFOs during sentencing waives a related claim of error on appeal. 174 Wn. App. at 911. As our supreme court noted, an appellate court may use its discretion to reach unpreserved claims of error. *Blazina*, 344 P.3d at 681. We decline to exercise such discretion here.

## V. SAG ARGUMENTS

Eaglespeaker argues in his SAG that the trial court erred by admitting the photographs of the text messages on J.R.'s cell phone without requiring the State to properly authenticate them under ER 901. We review the decision to admit this evidence for abuse of discretion. *Magers*, 164 Wn.2d at 181.

Under ER 901(a), "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." This requirement is met "'if sufficient proof is introduced to permit a reasonable trier of fact to find in favor of authentication or identification.'" *State v.*

*Bradford*, 175 Wn. App. 912, 928, 308 P.3d 736 (2013) (quoting *State v. Danielson*, 37 Wn. App. 469, 471, 681 P.2d 260 (1984)), *review denied*, 179 Wn.2d 1010 (2014).

In *Bradford*, Division One found sufficient evidence to support a finding that text messages were what the State purported them to be: messages that Bradford wrote and sent. 175 Wn. App. at 928-29. The content of the messages indicated that Bradford sent them because they were consistent with his previous threats and comported with his obsessive behavior at the time. *Bradford*, 175 Wn. App. at 929. Their timing also showed that Bradford sent them, because the messages disappeared when Bradford went to jail and reappeared upon his release. *Bradford*, 175 Wn. App. at 929-30.

Similarly, the court found sufficient authentification to support the admission of a photographed text message in *State v. Thompson*, 2010 ND 10, 777 N.W.2d 617 (2010). As the *Thompson* court observed, "[T]he proponent of offered evidence need not rule out all possibilities inconsistent with authenticity or conclusively prove that evidence is what it purports to be; rather, the proponent must provide proof sufficient for a reasonable juror to find the evidence is what it purports to be." 777 N.W.2d at 624; *see also State v. Andrews*, 172 Wn. App. 703, 709, 293 P.3d 1203 (because name used in text messages was name that defendant used, circumstantial evidence supported authentification and admission of photographed text messages), *review denied*, 177 Wn.2d 1014 (2013).

Here, the record shows that J.R. received the text messages at issue from her boyfriend's phone after she lent the phone to Eaglespeaker. Her boyfriend was incarcerated and unable to use his phone when J.R. received these messages. The text messages corresponded to some of Eaglespeaker's statements to law enforcement about his interaction with J.R., and they included a reference to "leaving your phone on your doorstep." RP (May 14, 2013) at 43. J.R. testified that

17

she found the phone in a bag on her doorstep with some baby formula that Eaglespeaker bought for her after the attack. The trial court did not abuse its discretion by finding sufficient evidence that the photographs of the text messages were what the State purported them to be: photographs of text messages from Eaglespeaker.

We affirm the defendant's judgment and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Melnick, J.

We concur:

Worswick, J.

Johanson, C.J.